THE TRUSTEES OF RUTGERS COLLEGE IN NEW JERSEY, DEFENDANT IN ERROR, v. J. WILLARD MORGAN, COMPTROLLER, PLAINTIFF IN ERROR.

Argued November 16, 1904—Decided March 6, 1905.

On error to the Supreme Court.    For opinion of Supreme Court, see 40 *Vroom* 460.

For the plaintiff in error, *Robert H. McCarter,* attorney-general.

For the defendant in error, *Richard V. Lindabury.*

PER CURIAM.

Saving in one respect, the opinion of Mr. Justice Van Syckel, in the Supreme Court, states the grounds upon which the judgment of that court is affirmed.   Only in regard to the decision that the *mandamus* should issue against the comptroller regardless of the conditional restriction imposed upon the state treasurer by the proviso of the act of March 31st, 1890, do we differ from the conclusions of the learned justice. In our view, the comptroller should not be compelled by *mandamus* to do a nugatory act, and we think that it was within his sound discretion to withhold his warrant upon the state treasurer until in orderly course it could be honored.

There is also an intimation in the opinion of Mr. Justice Van Syckel that seems to us to express a doubt where we entertain none, viz., his suggestion that the act of April 7th,

1903, might be regarded as an amendment to the act of March 31st, 1890. We think .it is clear that it could not be so regarded, and that the correct view of the later act is that expressed in the other suggestion of the learned justice, viz., that it was the substitution of a legal mode of payment for the illegal one adopted by the act of March 31st, 1890.

With these emendations, the opinion delivered in the Supreme Court states the grounds upon which the judgment of that court is affirmed.

GREEN, J. (dissenting). The bare enumeration of the points discussed reveals weighty and important questions as involved in the cause, but it does not disclose everything. Other subjects of inquiry suggest themselves to the thoughtful mind; such (by way of illustration) are whether it were possible to engraft so novel and, perhaps, incongruous a matter as instruction in agriculture and the mechanic arts, for suitably prepared applicants only, upon the courses of study established in the public free schools for the equal benefit of all the people of the state (see act of congress, chapter 130, approved July 2d, 1862; act of the legislature, chapter 108, approved March 31st, 1890; constitution of New Jersey, article 4, section 7, paragraph 6); whether it were possible effectively to amend antecedent legislation, different in title and scope, by supplemental appropriation acts of such form and language as those of April 7th and April 17th, 1903 (see act of the legislature, chapter 108, section 3, approved March 31st, 1890, and acts of the legislature, chapter 119, approved April 7th, 1903, and chapter 267, approved April 17th, 1903); whether the doubt as to constitutionality in the mind of the legislature of 1903 extended to the whole act of March, 1890, or only to the provision for payment in the third section thereof, as affected by the acts of April 7th and April 17th, 1903. See *Pamph. L., p.* 734 (at top).

I do not, however, find it necessary to answer any such inquiries. For present purposes, without setting. the seal of final approval upon the correctness of the assertion, I will

NOVEMBER TERM, 1904.           665

42 Vroom.          Rutgers College v. Morgan, Compt'r.

assume that which the relators appear to regard as a favorable statement of their own position, to wit, that the legislature, by the act of 1890, constitutionally and effectively extended the benefits of the state agricultural college (before that time established on the foundation of a federal grant) to additional students, resident in this state, "to the number of one, each year, from each assembly district," and that the supplemental appropriations acts of 1903 effectively amended the act of 1890, so as to make the payment for the services rendered and the instruction given, both financially possible and free from all trace of unconstitutionality under the constitution of New Jersey, article 4, section 7, paragraph 6, and article 4, section 7, paragraph 11, subdivision 10.

The sole question before us will then be, do the statutes of 1890 and 1903 disclose a contract for services in the form of instruction in the courses of study in the state agricultural college, and for payment therefor, and a subsequent arrangement touching the payment, both of which the legislature, on behalf of the state and the trustees of Rutgers college, representing and maintaining the agricultural college, were capable of making, the constitution of New Jersey, article 1, paragraph 20, being regarded? I will address myself, firstly, to that branch of the question which deals with the quantum and method of payment; it may be that we need go no further.

Chapter 119 of the acts of 1903, entitled "A supplement to an act entitled 'An act making appropriations for the support of the state government and for several public purposes, for the fiscal year ending October thirty-first, one thousand nine hundred and three,' approved April tenth, one thousand nine hundred and two," enacted: "To pay the state college for the benefit of agriculture and the mechanic arts the balance due for services rendered to the state, in the instruction, from September first, eighteen hundred and ninety, to July first, nineteen hundred and two, of students holding free state scholarships, granted pursuant to 'An act to increase the efficiency of the public school system of the state by providing for additional free scholarships at the state agricultural

college,' passed March thirty-first, eighteen hundred and ninety, there is hereby appropriated out of the state fund eighty thousand dollars   *   *   *   ." See *Pamph. L.* 1903, *p.* 202.

Chapter 267 of the acts of 1903, entitled "A supplement to 'An act making appropriations for the support of the state government and for several public purposes, for the fiscal year ending October thirty-first, one thousand nine hundred and three,' approved April tenth, one thousand nine hundred and two," spoke in similar strain, although in somewhat fewer words, but added this proviso: "*Provided,* such sum is authorized by enactment of the present legislature, such payment to be actually made by the treasurer of the state only when the act under which such services were rendered, entitled 'An act to increase the efficiency of the public school system of the state by providing for additional free scholarships at the state agricultural college," passed March thirty-first, one thousand eight hundred and ninety, shall have been judicially determined to be valid and constitutional." See *Pamph. L.* 1903, *p.* 734. By both of these laws we are authorized to look into the act of March 31st, 1890, in order to see not only what services were to be rendered, but also to see how the payment was to be ascertained, the sum finally appropriated being "due for services rendered to the state in the instruction   *   *   *   of students holding free state scholarships granted pursuant to" this statute.

Chapter 108 of the acts of 1890, entitled "An act to increase the efficiency of the public school system of the state by providing for additional free scholarships at the state agricultural college," enacted:

"SEC. 1. That in order that students in the schools in all parts of the state may receive the stimulus afforded by the opportunity to pursue the courses of study in the state agricultural college, and in order to enable the said state agricultural college to furnish instruction gratuitously to students, residents of this state, in its several courses of study, as special courses of advanced study in the public school system of this state, there shall be sent to the said college

students, to the number of one each year from each assembly district in this state, to be selected and designated as hereinafter provided, who shall receive gratuitous instruction in any or all of the prescribed branches of study in any of the courses of study of said state college. * * *

"SEC. 3. That each student so appointed and admitted to said college shall be regarded as holding a state scholarship, and *for each scholarship so held there shall be paid, as hereinafter provided,* on the first day of November in each year, to the treasurer of said college, *the same sum of money as the said college is entitled to receive for each scholarship established in the said college under the existing state agricultural college fund.* * * *

"SEC. 5. That this act shall take effect immediately * * *"

It is now to be noted that our inquiry into the measure of payment for instruction given to the holders of the new state scholarships is, by the act of 1890, pressed back, for intelligible answer, to the legislation which ascertained the payments for the scholarships under the then existing state agricultural college fund.

Chapter 369 of the acts of 1864, entitled "An act appropriating scrip for the public lands granted to the state of New Jersey, by the act of congress, approved July second, eighteen hundred and sixty-two," enacted (so far as it need now be quoted) :

"SEC. 2. That said commissioners shall semi-annually pay over the interest of the fund which may result from the sale of the said scrip to the trustees of Rutgers college in New Jersey, for the special purposes and upon the special conditions hereinafter set forth.

"SEC. 3. That said trustees shall devote said interest wholly and exclusively to the maintenance, in that department of Rutgers college known as Rutgers scientific school, of such courses of instruction (including the courses of instruction already established by said trustees) as shall carry out the intent of said act of congress in the manner specially prescribed by the fourth section of said act.

"SEC. 4. That said trustees shall furnish gratuitous education in said courses of instruction to pupils of said school in such manner as the legislature shall prescribe—*the number of pupils to be so received gratuitously into said school shall be in each year such a number as would expend a sum equal to one-half of the said interest for the same year, in paying for their instruction in said school, if they were required to pay for it at the regular rates charged to other pupils of said school for the same year.* \* \* \*

"SEC. 12. That this act shall take effect immediately." See *Pamph. L.* 1864, *pp.* 650, 651.

As we thus trace from statute to statute the method by which the payment is to be ascertained under the contract, it becomes apparent that, if in any year, the regular rate charged to each student who bore the expense of his own education, was fixed at $100, the sum of $10,000 would defray the expenses of one hundred students; but, if, in the same year, the interest of the fund paid over to the trustees of the college, should also amount to the sum of $10,000, the number of students to be gratuitously received would be such as would pay, at the regular rate, half of the said interest—that is to say, fifty students. Hence the students holding the new state scholarships under the act of 1890, and receiving education at the expense of the state, would be so educated, in the case supposed, at the rate of $200. If we put the proposition in general terms, it amounts to this: A rate adjudged fair and just in any year as between the trustees of Rutgers college in New Jersey, a private corporation, and a student whose instruction is paid by a private hand, is doubled when payment is to be made by the public—the state—for the instruction of a student holding a state scholarship. Could any such contract have been valid and constitutional in the year 1890? And how has it been made valid since then? It is to be observed that the method of payment was in nowise affected by the supplemental appropriations acts of 1903. If these wrought any change in earlier legislation, that change was in the fund from which the moneys were to be drawn, nothing more.

The paragraph of the state constitution which seems to bar such an agreement as was made in 1890 is this: "No donation of land or appropriation of money shall be made by the state or any municipal corporation to or for the use of any society, association or corporation whatever." Article 1, paragraph 20.

The first inhibition of this paragraph is directed to donations; that is to say, pure gifts, and is not of present consequence. The second inhibition is directed against appropriations of money to or for the use of any society, association or corporation. By appropriations, we understand the setting apart of public moneys by legislative vote or enactment, to be applied to specific objects of public expenditure. See *Rap. & Law. L. Dict., ad verbum* § 6; *Century Dict., ad verbum.* An analogous meaning has been assigned in New Jersey to the word "appropriations," occurring in a will. See *Whitehead et al* v. *Gibbons et al.,* 2 *Stock.* 230, 235. Now it is to be noted that the condemnation of the above paragraph of the constitution is not set upon all public appropriations to societies, associations, or corporations, for "no money shall be drawn from the treasury but for appropriations made by law" (*Constitution of New Jersey, art.* 4, § 6, ¶ 2) ; and we are not lightly to infer that the people intended to forbid all transactions and dealings between the state and any society, association or corporation. Such a conclusion might be very unnecessary and very inconvenient. The barrier of the constitution is, however, set up against "appropriations of money *to or for the use of* any society, association or corporation." The modifying phrase, *to or for the use of,* is to be regarded, and it bears great significance to the legal mind. For example, in an action of *indebitatus assumpsit,* upon the common counts respecting moneys, the plaintiff declares that the defendant is indebted to him "for so much money by the plaintiff, before that time, paid, laid out, and expended *to and for the use of the* defendant, at his special instance and request." See 2 *Chit. Pl.* (11*th Am. ed.*) *37, *87. Obviously, the moneys thus sought to be recovered had not come to the defendant as a just pay-

ment for services performed, goods sold and delivered, or otherwise, but they had been paid or expended for the peculiar benefit of the defendant, and at his solicitation, actual or supposed. This element of special, singular, selfish benefit involved in the phrase "to and for the use of," found in the common counts, is also in my opinion involved in the similar phrase found in the amended constitution, and it is upon this element that the condemnation of the above-quoted paragraph of the constitution rests. An appropriation by the state to a private corporation, founded upon a dealing wherein a sufficient *quid pro quo* is not easily discoverable and justly ascertainable, is forbidden by the constitution, article 1, paragraph 20. It matters not that the transaction takes the guise of a contract for services, or a contract for merchandise; it matters not that an obligation, otherwise legal or moral, is involved. These things are not sufficient to overthrow a constitutional provision which should be held strong against all attacks and safe from all evasions.

Why the State of New Jersey, through its legislature, should enter into a contract with the trustees of Rutgers college in New Jersey, a corporation, and in consequence thereof should make an appropriation to the said corporation, whereby there is or may be taken from the public treasury, for the education of each student holding a free state scholarship, double the sum which, at the same time, is esteemed a just payment for the education of a private student, is a matter not explained or justified in any statute or decision brought to our notice by counsel. I think such a contract and such an appropriation are not to be supported against the ban of the constitution, and my conclusion is that the judgment below should be reversed and holden for nothing. Hereupon it is suggested that this conclusion is, in effect, disposing of the cause—*firstly,* upon a point not presented to the Supreme Court; and *secondly,* upon a point not discussed in this court.

The rule which undoubtedly prompts the first suggestion may be traced back to *Oliver* v. *Phelps, Spenc.* 180, 185, and probably further. In that case, it is thus stated: "A party shall not be heard in an appellate court upon a point not

\* \* \* brought into discussion in the court below." The reasons which underlie the rule are that it is improper, in respect to the court below, to impute error to its judgment by raising a novel point, the mind of that court not having been directed to its consideration; and that it is improper, in respect to the court above, to subvert the principles of appellate jurisdiction by raising therein a new point for an original investigation. A perusal of the printed case and the decision below reveals that the suggestion firstly made lacks force in the present cause. It appears that the effect of the constitution of New Jersey, article 1, paragraph 20, upon the state's obligation to the trustees of Rutgers college, was insisted upon below by counsel, and considered at length by the Supreme Court. See *Rutgers College* v. *Morgan,* 41 *Vroom* 461. The fact that the effect of this paragraph of the constitution was considered in the court below may, under the rule above stated, be necessary to the consideration of its effect here (see New Jersey cases, *supra,* and *Norwich Gas and Electric Co.* v. *Norwich* (*Conn.*), 57 *Atl. Rep.* 750), but the force of the rule goes no further. This court and its members are not so trammeled by a rule adopted to promote orderly procedure and to subserve the administration of justice as to be obliged to hold constitutional legislative acts which are not constitutional, simply because it may be inconvenient or impossible specifically to affirm or deny the particular view of a constitutional question taken in the court below. Two cases in this court (*Crater* v. *Binninger,* 4 *Vroom* 513, 520, and *Packard* v. *Bergen Neck Railway Co.,* 25 *Id.* 553, 557, 558) show that a judgment may be reversed or affirmed here upon matters appearing in the case, but not specifically passed upon in the lower tribunal.

The rule which doubtless prompts the second suggestion is the very elementary one that unless he has by willfulness or neglect forfeited his right, no party should have his interests affected by the decision of a question upon which he has not been heard. We need not trouble ourselves to discover the reason underlying so just and axiomatic a proposition. Cases illustrative of some aspects of such rule, although quite differ-

ent from the case in hand, are *Hays* v. *Pennsylvania Railroad
Co.,* 13 *Vroom* 446, 447; *Kent* v. *Phenix Art Metal Co.,* 40
*Id.* 532, 540; *West Shore Railroad Co.* v. *Wenner,* 41 *Id.*
233 (at *p.* 240). But, again, a perusal of the briefs in the
present cause shows that the second suggestion is without
weight. Both counsel in this court discussed the operation
and effect of the constitution of New Jersey, article 1, para-
graph 20. The discussion filled seven pages of the brief of
counsel for the plaintiff in error, and six and a half pages
and also four pages of the brief of counsel for the defendants
in error. Again, it may be asserted that (the question having
been duly raised) this court is not so trammeled by rules of
procedure as to be obliged to hold an unconstitutional act to
be constitutional merely because it is unable to agree in every
detail with the view espoused by one or the other of contend-
ing counsel.

Further, it has been suggested that the legislature, having
in the act of April 7th, 1903, and the act of April 17th, 1903,
appropriated the round sum of $80,000, in payment for the
services alleged to have been rendered, we are not warranted
in looking into antecedent legislation for the purpose of
discovering how the payment for the services was to be or has
been ascertained. But this can hardly be a sound position.
The legislature did not, in 1903, adopt any new method of
ascertaining the payment to the trustees of Rutgers college.
The legislature did, in 1903, refer to the act of 1890, which
indicated a method of payment open to serious question. The
Supreme Court in its opinion has treated of the legislation
earlier than that of 1903, and counsel have dealt therewith
in their arguments. It must be that this court can look into
the antecedent legislation. It may be that it should do so,
even more deeply than in the foregoing pages. Perhaps, in
so doing, light will be thrown upon the fixing of the sum of
$80,000.

Under chapter 4 of the acts of 1902, approved March 4th,
1902, and entitled "An act to provide for adjusting the claim
of the state college for agriculture and the mechanic arts,
under 'An act to increase the efficiency of the public school

system of the state, by providing for additional free scholarships at the state agricultural college,' passed March thirty-first, one thousand eight hundred and ninety," a commission was appointed to examine into and consider the matters recited in the act, and to report thereon to the legislature. The commission did investigate, and reported to the legislature at the session of 1903, and submitted a draught of a bill. See *Exhibit A,* referred to in the alternative writ of *mandamus.* The commission, by its report, ascertained "the compensation due to the college, under the act of March 31st, 1890," to be the sum of $131,610, and inserted this sum in the draught bill. This bill, a different title having been prefixed, the sum appropriated having been reduced to $80,000, and a release having been stipulated for, the legislature enacted as chapter 119, acts of 1903, hereinbefore quoted at length. It is difficult to see how, in the acts of 1903, the legislature established any new method of ascertaining the payment to be made. The sum was reduced, indeed, but whether it was reduced arbitrarily, or because of an error seen in the computation of the commission, in nowise appears. Nevertheless, this does appear, that, if the sum of $131,610 was ascertained, in accordance with the acts of 1890 and 1864, above set forth (and presumably it was), the sum was double what the legislature could constitutionally agree in the year 1890 to pay, or could constitutionally appropriate to or for the use of the trustees of Rutgers college, in the year 1903. The appropriation of $80,000 diminished the sum unconstitutionally appropriated, but left under condemnation the difference between half of $131,610 and $80,000. Surely this court cannot say that unconstitutionality can be overlooked or condoned, provided the unconstitutionality be made small.

I therefore recur, after this digression, to the declaration that the contract and appropriation are under the ban of the constitution of New Jersey, article 1, paragraph 20, and that the judgment below should be reversed.

A question of minor importance which emerged in discussion now deserves brief treatment. The question was, since

the cause arises upon a demurrer, is the statute of April 4th, 1864, chapter 369 of the acts of 1864, properly before this court for consideration, the same not having been specifically mentioned in the alternative writ of *mandamus* or in any of the exhibits therein referred to? A negative answer to the question would rest upon the ground that the act of April 4th, 1864, is a private act, and may not be judicially noticed. See *Perdicaris* ads. *Trenton City Bridge Co.*, 5 *Dutcher* 367. I think, however, that such an answer would be improper.

Firstly, the statute thus questioned was freely referred to in the opinion of the Supreme Court and in the briefs of both counsel, who were heard in this court. It would seem inconvenient, therefore, if this court must exclude from view a law which it has been generally conceded is involved in the case. The argument *ab inconvenienti* must not, however, be reckoned upon too confidently; there are stronger reasons for the consideration of the statute, and I will briefly advert to them.

1. The act of April 4th, 1864, is a public statute in form. At the time of its passage there was in force in this state "An act relative to the laws of this state, the proceedings of the legislature, and the distribution thereof, and of the laws of the United States (Revision)," approved April 16th, 1846. See *Nix. Dig.* (1868), *pp.* 911, 913. By the fourteenth section of this act it was declared "that from and after the passing of this act, all *public* acts which shall be hereafter passed shall not go into operation or be in force until the fourth day of July next after the passage of any such act, unless otherwise specially provided for in such act." There was no like provision as to private acts. The fact that the act of April 4th, 1864 (see *Pamph. L., p.* 652), contained, as its section 12, "that this act shall take effect immediately," is evidence that the act was intended to be and is a public statute. It may also be remarked that the act was so published and indexed in the session laws of that year. See *Pamph. L., p.* 867.

2. The act of April 4th, 1864, is also a public statute, in substance. It appointed five of the chief officers of the state, and their successors, to be commissioners for certain purposes

set forth in the act. It treated of the establishment and maintenance of the courses of instruction prescribed by the federal congress. It secured the admission to those courses of pupils from every county in the state. It provided for free public lectures on agriculture in every county. It provided for a board of visitors, charged with the duty of visiting the school and reporting to the legislature. A statute dealing with matters of such a nature is public, according to the tests laid down by the best authorities. · See *Rap. & Law. L. Dict., ad verba, "Private Acts," "Public Acts;" "The Report of the British Commissioners on the Promulgation of Statutes." Wilb. Stat. L.* (1881), *pp.* 218, 221.

Our constitution does, for certain purposes, subdivide statutes into general, special, local and private; but we are not, at this moment, dealing with a constitutional question, and are not concerned with so minute a subdivision. The present inquiry relates to matters of pleading and evidence only, and, in such an inquiry, statutes are regarded as falling into one or the other of two classes—sometimes called general and special, sometimes public and private. See *Wilb. Stat. L., ubi supra; 1 Bl. Com.* *86.

The statute which has been questioned is, I think, a public one, and is properly before us for consideration without being specially pleaded. See *Hawthorne* v. *Mayor of Hoboken,* 3 *Vroom* 172, 175.

*For affirmance*—GARRISON, GARRETSON, REED, BOGERT, VOORHEES, GRAY. 6.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, PITNEY, SWAYZE, GREEN. 5.