249 So.2d 569

**Harvey FUSELIER**

**v.**

**STATE MARKET COMMISSION et al.**

**No. 50882.**

June 7, 1971.

Rehearing Denied June 28, 1971.

Nolan J. Edwards, Crowley, for plaintiff-appellant-respondent.

Jack P. F. Gremillion, Atty. Gen., Don M. Arata, Bogalusa, Sp. Counsel for State Bond and Building Commission.

Benton & Moseley, Fred G. Benton, Sr., Fred G. Benton, Jr., Baton Rouge, for defendant-appellee-applicant.

SUMMERS, Justice.

Plaintiff, Harvey Fuselier, a citizen and taxpayer residing in Acadia Parish, brought this class action attacking the constitutionality of Act 172 of 1969 which authorizes the State Bond and Building Commission to borrow money and issue bonds therefor, the funds thus derived to be made available to the State Market Commission for a loan to Crowley Grain Drier, Inc. and others. Defendants are the State Market Commission, its Chairman and Secretary; the State Commissioner of Agriculture and Immigration, an ex-officio member of the Commission; and Crowley Grain Drier, Inc., a business corporation organized under Louisiana law. The suit seeks to enjoin defendants from utilizing bond proceeds to be issued under authority of the Act for the purpose of making a loan to Crowley Grain Drier, Inc.

Defendants filed an exception of no cause of action which the trial court sustained. On appeal to the Third Circuit that court noticed that the State Bond and Building Commission was an indispensable party who should be joined in the action. La.Code Civil Proc. art. 646. The trial court judgment was, therefore, set aside, and the case was remanded to permit the plaintiff to amend his petition to make the State Bond and Building Commission a party. 231 So.2d 652 (La.App.1970).

On remand, by supplemental petition, the State Bond and Building Commission was made party defendant and an exception of no cause of action was again filed by all defendants and maintained by the trial court. A second appeal was taken to the Third Circuit where the trial court judgment was reversed. 238 So.2d 243 (La.App. 1970). We granted certiorari on application of defendants. 256 La. 852, 239 So.2d 357 (1970).

The State Market Commission was created in 1940 (La.R.S. 3:401, et seq.) to implement the constitutional mandate directing the legislature to enact laws fostering agriculture and immigration and preventing the spread of pests and disease injurious to plants and domestic animals. La.Const. art. 6, § 14. Article IV, Section 12-b of the Constitution was adopted in

1944 to enlarge the power and authority of the Commission, giving that body the authority to make loans as follows:

The State Market Commission shall have the power and authority to lend or underwrite, participate in or guarantee the repayment of twenty-five (25%) per centum of any loan made by any bank, financial institution or Federal agency for the purchase, expansion, improvement or construction of any agricultural plant, which, in the judgment of said Commission, may provide additional facilities for the processing, marketing, distributing or storing of agricultural products of the State, to the end that agricultural products of the state may be better preserved and marketed, *and the Legislature is authorized to make such appropriations as it may deem necessary to effectuate the provisions of this paragraph.* (Emphasis added.)

Acting upon this authorization the legislature enacted Act 113 of 1944 (La.R.S. 3:410) setting out in broad terms the conditions under which the loan transactions authorized by the constitution would be undertaken. Insofar as pertinent here, the Act provides:

To encourage the construction, expansion, improvement, or betterment of agricultural plants for the processing, marketing, distributing, or storing of agricultural products, the commission may:

(1) Lend or advance to any person, firm, corporation, partnership, or association of this state engaged in the operation of any agricultural plant as is described in this Section, a sum not in excess of twenty-five per centum of the amount to be expended for the expansion, improvement, or betterment of the plant and for any such loan the borrower shall execute a note payable to the commission within such time and on such terms, together with such endorsement and security, as the commission may require.

Thereafter the contested Act 172 of 1969 (See Appendix) was enacted authorizing the State Bond and Building Commission to borrow money and issue bonds or other obligations in an amount not exceeding two million dollars, the bond proceeds to be made available to the State Market Commission for use in accordance with Act 113 of 1944 (La.R.S. 3:410) as authorized by Article IV, Section 12-b of the Constitution. Included within the Act was a provision that all proceeds of the bonds were to be deposited in the State Treasury by the State Bond and Building Commission to be made available to the State Market Commission to carry out its purposes under Act 113 of 1944 (La.R.S. 3:410) and Article IV, Section 12-b of the Constitution for certain enumerated projects, included among which was $40,000 for a rice drier at Crowley, Louisiana.

Purportedly acting pursuant to the foregoing constitutional and statutory authority, the Commission adopted a resolution on December 13, 1966 approving a loan to Crowley Grain Drier, Inc., in the sum of $40,000 for building a rice drier in Crowley which would cost in excess of $200,000. Proceeds of the bonds to be issued under authority of Act 172 of 1969 were to be used for the purpose.

This is the action which plaintiff Fuselier seeks to restrain, asserting several grounds to support his attack on the constitutionality of Act 172 of 1969 authorizing the borrowing of money and issuance of bonds from which the funds for the loan to Crowley Grain Drier, Inc. are to be derived.

I.

First, plaintiff contends Act 172 of 1969 is unconstitutional, for it transcends the grant of power in Article IV, Section 12–b of the constitution authorizing the legislature to make "appropriations" for the Commission to carry out its purposes. This authorization to make "appropriations" for funds to be used by the Commission does not, it is contended, carry with it an authorization to the legislature to borrow funds and issue bonds for the Commission's use as Act 172 of 1969 purports to do.

The issue is, therefore, whether the incurring of debt and allocation of bond proceeds under Act 172 of 1969 constitutes an "appropriation" as that word is used in Article IV, Section 12–b, and, further, whether this incurring of debt and allocation of bond proceeds is a "specific appropriation made by law" as required by Article IV, Section 1 of the Constitution requiring that:

No money shall be drawn from the treasury except in pursuance of specific appropriation made by law; nor shall any appropriation of money be made for a longer term than two years. A regular statement and account of receipts and expenditures of all public moneys shall be published every three months, in such manner as shall be prescribed by law.

As we understand the constitutional authorization (La.Const. art. 4, § 12–b), loans made by the State Market Commission are to be made on the basis of "appropriations" by the legislature. This means, first, that the loan must be made in "pursuance of specific appropriation made by law" (La. Const. art. 4, § 1), that is, the legislature must designate the purpose and amount of each loan with sufficient particularity to properly identify the use to which the funds are to be put. Carso v. Board of Liquidation of State Debt, 205 La. 368, 17 So.2d 358 (1944). In short, an appropriation is the setting apart of public moneys by legislative vote or enactment to be applied to specific objects of public expenditures. Trustees of Rutgers College v. Morgan, 71 N.J.L. 663, 60 A. 205 (1905).

Thus, an "appropriation" contemplates that the sums authorized to be paid out by the legislature will be derived from funds in the Treasury of the State at the time it is made. State ex rel. Murray v. Carter, 30 P.2d 700 (Okl.1934); State ex rel. Lee v. Hartman, 69 N.M. 419, 367 P.2d 918 (1961); 81 C.J.S., States, § 165. To this extent, therefore, it may be said that Act 172 of 1969 is within the scope of Article IV, Section 12–b, since it designates with particularity the amount and purpose for which the funds are to be used and authorizes withdrawal from the treasury. However, when a constitutional amendment authorizes the legislature to "appropriate" funds for a particular purpose, as the constitutional amendment in question does (La.Const. art. 4, § 12–b), this authorization cannot be translated into a license to incur debt and issue bonds in a manner which is contrary to existing established constitutional standards.

## II.

■■■ This brings us to the plaintiff's contention that Act 172 of 1969 is constitutionally infirm, for the Act authorizes the incurring of debt and the issuance of bonds for loans to business corporations owned by private interests contrary to Article IV, Section 2 of the Constitution. Article IV, Section 2, prohibits the legislature from contracting directly, or through any state board or state agency the incurring of debt or issuance of bonds involving the dedication of all or any part of the tax revenues imposed and collected by the State, except upon the two-thirds vote of the elected membership of each of the Houses and then *"only if the funds are to be used to make capital improvements, repel invasion or suppress insurrection."* The prohibition, however, shall not apply "to any state board, authority, commission or other state agency empowered by other Constitutional authorization or to any law adopted by the Legislature within the scope of any such other Constitutional authorization."

At the outset it is quite evident to us that when the constitution prohibits the legislature from incurring debt, except where the funds are to be used for "capital improvements", the constitution is referring to capital improvements which are, or will become, public property of the State or one of its subdivisions and not capital improvements belonging to business corporations owned by private interests, or other interests. Without any effort to limit the constitutional meaning of capital improvements, we cite some examples which we feel are contemplated by the constitution: construction, enlargement, improvement, repair, and remodeling of *public buildings,* structures, facilities and other physical improvements at the educational, charitable, correctional, penal or other institutions of the State.

Defendants contend, however, that even if they concede that the loan contemplated

for Crowley Grain Drier, Inc., is not a "capital improvement" within the meaning of the constitution, the prohibition is subject to exceptions, one of which applies to Act 172 of 1969. The exception relied upon provides that the prohibition against incurring debt shall not apply "to any state board, authority, commission or other state agency empowered by other Constitutional authorization or to any law adopted by the Legislature within the scope of any such other Constitutional authorization." Thus the argument proceeds, Act 172 of 1969 was enacted within the scope of Article IV, Section 12–b of the Constitution, and therefore it is a law adopted by the legislature on behalf of a state board, authority, commission or state agency "empowered by other Constitutional authorization" to incur debt contrary to the prohibition contained in Article IV, Section 2.

The fallacy of this argument is readily apparent from the discussion in Part I of this opinion. There it was pointed out that Article IV, Section 12–b, was *not* an authorization to incur debt and issue bonds to accomplish the purposes of the State Market Commission, it being simply an authorization to the legislature to appropriate funds for that purpose. In explaining that an authorization to the legislature to "appropriate" was not an authorization to incur debt and issue bonds, we sought to make it clear that the incurring of debt and the issuance of bonds was to be accomplished

under established constitutional standards. We add now that Article IV, Section 2, is an integral part of these constitutional standards which have been unaffected by Article IV, Section 12–b.

Neither the legislature nor the State Bond and Building Commission, therefore, was "empowered" by Article IV, Section 12–b, to incur debt or issue bonds contrary to the prohibitions contained in Article IV, Section 2. The legislature could not, in consequence, authorize the State Bond and Building Commission by Act 172 of 1969 to incur debt or issue bonds to accomplish the purposes of the State Market Commission, contrary to Article IV, Section 2. Act 172 of 1969 is therefore unconstitutional.

For the reasons assigned, the matter is remanded to the trial court with instructions to issue the injunction prayed for.

SANDERS, J., dissented for the reasons cited by HAMLIN, J.

TATE, J., recused, having participated in Court of Appeal's consideration.

### APPENDIX
*Act 172 of 1969:*

\*     \*     \*     \*     \*     \*

Be it enacted by the Legislature of Louisiana:

Section 1. The borrowing of money or funds and the issuing and sale of bonds or

other obligations by the State Bond and Building Commission, a body politic and corporate, in an amount not to exceed Two Million Dollars ($2,000,000.00) which fund or any part thereof shall from time to time be made available to the State Market Commission to be used by said Commission as provided by Title 3, Section 410, Chapter 5, of the 1950 Revised Statutes of the State of Louisiana (Act 113 of the Regular Session of the Legislature of 1944), and as authorized by Article IV, Section 12–b of the Constitution and as more particularly hereinafter set forth, is hereby authorized.

The State Bond and Building Commission shall have and is hereby granted authority and power to fund into bonds of the State Bond and Building Commission the Fifty-three hundredths (0.53) mill tax, levied upon all taxable property within the State of Louisiana by Act 109 of 1921 as amended (R.S. 47:1704).

The said bonds or other obligations herein authorized to be issued and sold shall be negotiable instruments, and shall be general obligations of the state of Louisiana, for the payment of which the full faith and credit of the state is hereby pledged. Said bonds shall be serial bonds, and shall have such maturities as may be determined and fixed by said Commission, shall be issued in such form and in such sums and denominations as said Commission may determine, but for not less than One Thousand Dollars ($1,000.00) each, and may be registered or payable to bearer at the discretion of said Commission; provided that the total amount of bonds which are hereby authorized to be issued and sold shall not exceed the sum of Two Million Dollars ($2,000,000.00); provided further that said bonds may contain such provisions as may be by said Commission deemed expedient for registration in the name of the holder or for the release thereof from registration; shall be issued at such time or times and with such series designations as may be authorized by said Commission and shall be payable as to principal at such time or times as said Commission may prescribe, beginning not more than four (4) years after date of said bonds and running for a period not to exceed twenty (20) years from date of issue, and the interest on said bonds shall be payable semi-annually at the place or places fixed for payment of the principal and interest by said Commission, and said bonds may be redeemable in inverse order prior to maturity at such redemption premiums, not exceeding two per centum (2%) of the par value of said bonds, as the said Commission shall determine by resolution prior to the issuance of said bonds, and said bonds shall be sold to the highest bidder on sealed proposals at public sale for not less than par and accrued interest after publication of a notice of sale at least once a week for three consecutive weeks, the first notice to appear in

one or more daily newspapers published in the City of New Orleans and in a financial publication in the City of New York and such other places as may be determined, at least fifteen (15) days prior to the date fixed for the sale of said bonds, reserving to the State Bond and Building Commission the right to reject any and all bids, including the right to readvertise for new bids, in accordance with the provisions herein contained.

So long as any of the bonds issued hereunder are outstanding, the fifty-three hundredths (0.53) mill tax, levied upon all taxable property within the State of Louisiana by Act 109 of 1921, as amended, (R.S. 47:1704), shall continue to be levied and collected and said tax shall primarily be pledged and dedicated to the retirement of said bonds and the payment of interest thereon, and the State Treasurer is hereby authorized and directed to remit from time to time to the State Bond and Building Commission from the avails of said tax amounts sufficient to pay the principal of and interest on bonds or other obligations issued under the provisions of this Act as the principal of said bonds and the interest thereon shall become due and payable and after paying or providing for the payment of the existing bonds maturing in each fiscal year and the interest on said bonds, for the payment of which said tax is hereby pledged and dedicated, the balance, if any; of said avails of the fifty-three

hundredths (0.53) mill tax levied upon all taxable property within the State of Louisiana by Act 109 of 1921, as amended, (R.S. 47:1704) over and above the amount required to pay the bonds or other obligations issued hereunder and the interest thereon for the next ensuing year shall be deemed to be surplus revenue and may be credited by the State Treasurer to the State's General Fund. All of the proceeds derived from the sale of the bonds or other obligations herein authorized, shall be deposited in a special fund in the State Treasury by the State Bond and Building Commission and the State Treasurer shall from time to time make available to the State Market Commission such sums as may be required to carry out the purposes set forth by Title 3, Section 410, Chapter 5 of the Louisiana Revised Statutes of 1950 (Act 113 of the Regular Session of 1944), as authorized by Article IV, Section 12-b of the Constitution for the projects hereinafter enumerated and in the order of priority hereinafter set forth:

1. Feed Pelletizing * * *

2. Rice Drier, Crowley, La. ...40,000.00

    *    *    *    *    *    *

The Louisiana State Bond and Building Commission is authorized, in adopting a resolution or resolutions authorizing the issuance of bonds or other obligations under the provisions of this Act, to pledge any or all revenues authorized to be

pledged to the payment of such bonds or other obligations by this Act.

.* * * * * *

HAMLIN, Justice (dissenting).

Finding that the majority opinion has too narrowly construed the constitutional provisions and legislative enactments herein involved, I respectfully dissent for the following reasons:

Agriculture is the backbone of this nation, and Louisiana has long engaged in the production of varied agricultural crops. The people, as well as the Legislature of Louisiana, have recognized the fact that agriculture cannot exist without assistance. Article VI, Section 14, Louisiana Constitution of 1921, amended by Act 548 of 1966, adopted November 8, 1966, recites:

"The Legislature is hereby directed to enact laws fostering agriculture, and preventing the spread of pests and diseases injurious to plants and domestic animals. It may enact laws limiting or prohibiting the cultivation of specified crops in definite zones or areas and providing the necessary funds to compensate for damages caused by such limitations or prohibitions."

LSA–R.S. 3:401 provides for the creation of the State Market Commission under the authority of Article VI, Section 14, of the Constitution, supra, and states that it shall be composed of nine members—the

Commissioner of Agriculture and Immigration and eight members to be appointed by the Governor. LSA–R.S. 3:407 recites, "The commission may encourage and assist any person, firm, corporation, partnership, association, or municipality in the purchase, expansion, improvement, or construction of any agricultural facility or plant, which, in the judgment of the commission, may provide additional facilities for the assembling, processing, grading, marketing, distributing, or storing of agricultural and kindred products of the state."

Section 12–b, self-operative, was added to Article IV of the Constitution by Act 319 of 1944, adopted November 7, 1944; it recites:

"The State Market Commission shall have the power and authority to lend or underwrite, participate in or guarantee the repayment of twenty-five (25%) per centum of any loan made by any bank, financial institution or Federal agency for the purchase, expansion, improvement or construction of any agricultural plant, which, in the judgment of said Commission, may provide additional facilities for the processing, marketing, distributing or storing of agricultural products of the State, to the end that agricultural products of the state may be better preserved and marketed, and the *Legislature is authorized to make such appropriations as it may deem necessary*

*to effectuate the provisions of this paragraph."* (Emphasis ours.)

Implementing the above constitutional provision is LSA–R.S. 3:410 which grants to the State Market Commission the authority to make loans to encourage the construction, expansion, improvement, or betterment of agricultural plants for the processing, marketing, distribution or storing of agricultural products.[3]

3. LSA–R.S. 3:410 provides:

*"Authority to make loans*

"To encourage the construction, expansion, improvement, or betterment of agricultural plants for the processing, marketing, distributing, or storing of agricultural products, the commission may:

"(1) Lend or advance to any person, firm, corporation, partnership, or association of this state engaged in the operation of any agricultural plant as is described in this Section, a sum not in excess of twenty-five per centum of the amount to be expended for the expansion, improvement, or betterment of the plant and for any such loan the borrower shall execute a note payable to the commission within such time and on such terms, together with such endorsement and security, as the commission may require.

"(2) Lend or advance to any person, firm, corporation, partnership, or association wishing to purchase any existing agricultural plant, originally designed and constructed for the purpose of processing, marketing, distributing, or storing agricultural products, a sum not in excess of twenty-five per centum of the amount required for the purchase of the plant, and the borrower shall execute a note, payable to the commission within such time and on such terms, together with such security, as the commission may require.

"(3) Participate in any loan made by any bank, financial institution, or federal agency to any person, firm, corporation, partnership, or association for the purchase, construction, expansion, improvement, or betterment of any agricultural plant, which in the judgment of the commission, may provide additional facilities for the processing, marketing, distributing, or storing of agricultural products.

Participation on the part of the commission shall not exceed twenty-five per centum of the total amount required by the borrower for any purpose herein authorized and participation shall be on the following basis:

"(a) Participation on the part of the commission in a joint loan of this nature, when the commission's participation is paid direct to the borrower, shall be evidenced by a note properly executed by the borrower, payable to the commission within such time and on such terms, together with such security as the commission may require.

"(b) Participation on the part of the commission in a joint loan of this nature, when the commission's participation is paid direct to the bank, financial institution, or federal agency through which the loan was negotiated, shall be evidenced by a participation certificate, properly executed by the bank, financial institution or federal agency, payable to the commission, setting forth the terms and conditions under which the commission agreed to participate, the amount of the participation, the security pledged for repayment, and the time within which such loan shall be liquidated.

"(4) Underwrite and guarantee payment not in excess of twenty-five per centum of any loan made by any bank, financial institution, or federal agency to any person, firm, corporation, partnership, or association for the purchase, construction, expansion, improvement, or betterment of any agricultural plant which, in the judgment of the commission, may provided additional facilities for the processing, marketing, distributing, or storing of agricultural products. When any portion of any loan is underwritten and guaranteed by the commission, an agree-

Showing its interest in the expansion of Louisiana agriculture, the Legislature in 1964 passed a joint resolution, House Bill No. 908, Act 538, increasing to 75% the per centum set out in Art. IV, Sec. 12–b, supra; the amendment to the Constitution failed to be ratified by the people of the State.

In 1965, the Legislature passed a joint resolution, Senate Bill No. 46, Act 168, which proposed an amendment to the first paragraph of Sec. 2 of Art. IV of the Constitution. It limited the purposes for which the Legislature could contract or authorize the contracting of debt on behalf of the State and issue bonds or other evidences of indebtedness thereof by requiring the vote of two-thirds of the Members elected to each House of the Legislature. The amendment provided that such bonds or evidences of indebtedness shall be guaranteed by the full faith and credit of the State but not requiring public referendum. The amendment, adopted by the people on November 8, 1966, recites in part:

"Except as otherwise provided herein, the Legislature shall have no power to contract directly or through any State Board or State Agency the incurring of debt or the issuance of bonds involving the dedication of all or any part of the

---

ment shall be executed in the form of a commitment setting forth the terms and conditions under which the commission is obligated and the extent to which repayment of the loan is guaranteed; when a commitment is executed, the commission shall forthwith set aside and impound in a special fund, a sum equal to the amount of its commitment, which amount shall remain impounded until the commitment has been redeemed and cancelled.

"(5) The commission may lend, underwrite and guarantee twenty-five per cent of the amount expended for facilities to finish agricultural products, and/or to manufacture containers, materials, and supplies used in the marketing of agricultural products; Added Acts 1966 No. 502, § 1.

"(6) The commission is authorized to take whatever steps necessary to protect the state's interest in any property mortgaged to secure loans made under the provisions of this Chapter, by paying off the first mortgage or the interest of the lending agency and being subrogated to the lending agency's interest in the property mortgaged. Added Acts 1966, No. 502, § 1."

Sections 1 through 4 were incorporated in the Revised Statutes of 1950. Sections 5 and 6 were enacted by the Legislature in 1966. Footnotes to the Statute recite:

"*Constitutional Provisions.* Const.1921, Art. 4, § 12–b authorizes the State Market Commission to lend or underwrite, participate in or guarantee the repayment of 25% of any loan made for the purchase, expansion, improvement or construction of any agricultural plant which, in the opinion of the Commission, may provide additional facilities for the processing, marketing, distributing or storing of agricultural products of the state."

"Acts 1964, No. 298, amending R.S. 3:410, provided in section 3 as follows: 'This Act shall take effect and become operative if, as and when the proposed amendment to Section 12–b of Article IV of the Constitution of Louisiana, incorporated into House Bill No. 908, [Acts 1964, No. 538] introduced at this session is finally adopted at the General Election in November, 1964.' The amendment failed to pass in the November 3, 1964 General Election."

tax revenues imposed and collected by the state except upon the two-thirds vote of the elected membership of each of the Houses and then only if the funds are to be used to make capital improvements, repel invasion or suppress insurrection. If the purpose is to make capital improvements, the nature, approximate location and, if more than one project, the amount allocated to each and the order or priority shall be stated in the Act or in a capital budget otherwise adopted according to law. The full faith and credit of the State shall be pledged to the repayment of such bonds or other evidences of indebtedness. Public referendum shall not be required. This prohibition shall not apply to cities, towns and villages, parishes, school boards or any other local political subdivisions of any kind; nor shall it apply to any state board, authority, commission or other state agency

empowered by other Constitutional authorization or to any law adopted by the Legislature within the scope of any such other Constitutional authorization; nor shall it apply to any state board, authority, commission or other state agency created by an Act of the Legislature with respect to any proposed debt to be incurred thereunder and any proposed bonds to be issued in connection therewith where secured solely from the revenues of the project." [4]

Act 172, herein involved, was passed by the Legislature in 1969. In his Reasons for Judgment, the trial judge ably and correctly analyzes its provisions as follows:

"Act 172 of 1969 authorizes the State Bond and Building Commission to borrow money and issue bonds in an amount not to exceed Two Million Dollars ($2,000,-000) which bonds, or any part thereof,

---

4. In 1958, Sec. 12 of Art. IV, La.Const. of 1921, was amended; the amendment, adopted by the people on November 4, 1958, recites in part:

"The funds, credit, property or things of value of the State, or of any political corporation thereof, shall not be loaned, pledged or granted to or for any person or persons, associations or corporations, public or private; nor shall the State, nor any political corporation, purchase or subscribe to the capital stock or stock of any corporation or association whatever, or for any private enterprise. Nor shall the State, nor any political corporation thereof, assume the liabilities of any political, municipal, parochial, private or other corporation or association whatsoever, except as otherwise provided in this

Constitution; nor shall the State undertake to carry on the business of any such corporation or association, or become a part owner therein; provided, the State, through the Legislature, shall have power to grant the necessary rights of way through its public lands for the construction of any railroad, or flood control or navigation canal; and provided, police juries and municipal corporations may, in providing for destitute persons, utilize any charitable institutions within their corporate limits for the care, maintenance and asylum of such persons; and all appropriations made to such institutions for the purpose aforesaid, shall be accounted for by them in the manner required of officials entrusted with public funds."

shall be made available to the State Market Commission to be used by the Commission as provided by Title 3, Section 410 and as authorized by Article 4, Section 12(b). The Act further authorizes the State Bond and Building Commission to fund into bonds the fifty-three hundredths (.53) mill tax levied upon all taxable property within the State of Louisiana, by R.S. 47:1704, and provides that the bonds shall be general obligations of the State of Louisiana for the payment of which the full faith and credit of the State is pledged. The Act also provides that all of the proceeds derived from the

sale of the bonds shall be deposited in a special fund in the Bond and Building Commission and the State Treasurer from time to time shall make available to the State Market Commission such funds as may be required to carry out the purposes set forth by Title 3, Section 410 and Article 4, Section 12(b) for projects enumerated in the Act and in the order of priority set forth in the Act. The second item enumerated in the Act is for a rice dryer in Crowley, Louisiana, in the amount of Forty Thousand Dollars ($40,000)." [5]

5. Act 172 of 1969 recites in part:

"Section 1. The borrowing of money or funds and the issuing and sale of bonds or other obligations by the State Bond and Building Commission, a body politic and corporate, in an amount not to exceed Two Million Dollars ($2,000,000.00) which fund or any part thereof shall from time to time be made available to the State Market Commission to be used by said Commission as provided by Title 3, Section 410, Chapter 5 of the 1950 Revised Statutes of the State of Louisiana (Act 113 of the Regular Session of the Legislature of 1944), and as authorized by Article IV, Section 12-b of the Constitution and as more particularly hereinafter set forth, is hereby authorized.

"The State Bond and Building Commission shall have and is hereby granted authority and power to fund into bonds of the State Bond and Building Commission the Fifty-three hundredths (0.53) mill tax, levied upon all taxable property within the State of Louisiana by Act 109 of 1921 as amended (R.S. 47:-1704).

"The said bonds or other obligations herein authorized to be issued and sold shall be negotiable instruments, and shall be general obligations of the state of Louisiana, for the payment of which the full faith and credit of the state is hereby pledged. * * *

" * * * All of the proceeds derived from the sale of the bonds or other obligations herein authorized, shall be deposited in a special fund in the State Treasury by the State Bond and Building Commission and the State Treasurer shall from time to time make available to the State Market Commission such sums as may be required to carry out the purposes set forth by Title 3, Section 410, Chapter 5 of the Louisiana Revised Statutes of 1950 (Act 113 of the Regular Session of 1944), as authorized by Article IV, Section 12-b of the Constitution for the projects hereinafter enumerated and in the order of priority hereinafter set forth:

"1. Feed Pelletizing Mill, Mer Rouge, La. ................ $187,500.00

"2. Rice Drier, Crowley, La. ............ 40,000.00"

I believe that Section 12–b of Article IV of the Constitution, supra, is a special constitutional amendment adopted in 1944. It vested the State Market Commission, a State Agency, with powers to lend, underwrite, participate in, or guarantee the repayment of 25% of certain loans made for agricultural purposes. The amendment authorized the Legislature to make appropriations as it may deem necessary to effectuate the provisions of the amendment. Section 12–b was neither repealed nor amended by Act 168 of 1965, Article IV, Section 2, supra, of the Constitution.

"It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment. Where the special statute is later it will be regarded as an exception to or qualification of the prior general one; and where the general act is later the special statute will be considered as remaining an exception to its terms unless it is repealed in general words or by necessary implication. People v. Breyer, 139 Cal.App. 547, 550, 34 P.2d 1065, 1066 and cases cited there." Arata v. Louisiana Stadium and Exposition District, 254 La. 579, 225 So.2d 362, 372.

"* * * the general rule is that a general statute does not repeal a special statute unless the purpose to do so is clearly manifest, such as where the provisions of a general and a local or special act are so irreconcilably conflicting that both cannot be given effect. * * *" McManemin v. Bossier Parish Police Jury, La.App., 228 So.2d 36, 40.

In my opinion Act 172 of 1969, as well as LSA–R.S. 3:410, supra, are implementations of Article IV, Section 12–b, Louisiana Constitution of 1921. The allocation of bond proceeds under Act 172 of 1969 constitutes an "appropriation" as the word is used in Section 12–b. The Constitutional section and the statutes treat of agriculture and are therefore "special"; they are not superseded by Article IV, Section 2, Louisiana Constitution of 1921.

I think that Act 172 of 1969 is a Legislative appropriation effectuating the provisions of Article IV, Section 12–b, Louisiana Constitution of 1921. The nature of the transaction—appropriation by the Legislature effectuating Section 12–b of Article IV, Louisiana Constitution of 1921—is not changed by the fact that bonds are sold by the State Bond and Building Commission and their proceeds deposited in the State Treasury to be made available to the State Market Commission for loans for specifically enumerated agricultural purposes such as a rice drier, Crowley, Louisiana.

"* * * The term 'specific appropriation made by law' means an appropriation made by an act of the Legisla-

ture, of a specified sum of money for a specified purpose." Carso v. Board of Liquidation of State Debt, 205 La. 368, 17 So.2d 358, 364.

"In specific terms, an 'appropriation' may be defined as an authority of the legislature, given at the proper time and in legal form to the proper officers, to apply a distinctly specified sum from a designated fund out of the treasury, in a given year, for a specified object or demand against the state. In general terms, an appropriation is the act of setting money apart formally or officially for a special use or purpose by the legislature in clear and unequivocal terms in a duly enacted law." 42 Am.Jur., Public Funds, Sec. 43, p. 747.

"An appropriation is an authority from the legislature, given at the proper time and in legal form to the proper officers, to apply sums of money out of that which may be in the treasury in a given year to specified objects or demands against the state. An appropriation is legislative sanction for the disbursement of public revenue." 81 C.J.S. States § 165, p. 1223.

The Court of Appeal agreed with plaintiff's contention that Act 172 of 1969 violates Article IV, Section 2, Louisiana Constitution of 1921, as that section authorizes the issuance of bonds only for the purpose of making capital improvements, and not for loans to third parties for the purpose of making capital improvements. I believe that the contention is erroneous and that the trial judge correctly answered it as follows:

"Article 4, Section 2 prohibits the Legislature from contracting directly or through any state board or state agency the incurring of debt or the issuance of bonds involving the dedication of tax revenues except on two-thirds (⅔) vote of the elected membership of the houses, and then only if the funds are to be used to make capital improvements, repel invasion or suppress insurrection. However, Article 4, Section 2 also provides that it shall not apply 'to any state board, authority, commission, or other state agencies empowered by other constitutional authorization or to any law adopted' by the Legislature within the scope of 'any *such other constitutional authorization.*' (Italics added.) In the present case the complete answer to the contention here made is that Act 172 of 1969 was enacted within the scope of Article 4, Section 12 (b) of the Constitution. Therefore, it is a law adopted by the Legislature within the scope of *other constitutional authorization*, and comes within one of the exceptions of Article 4, Section 2.

"Article 4, Section 2 of the Constitution, as amended by Act 168 of 1965 and adopted November 8, 1966, makes it possible for the Legislature to incur indebtedness to be payable from state tax reve-

nues without the necessity of creating a state agency. (For example: Capital Construction and Improvement Commission [Act 73 of 1965, R.S. 39:455.1, et seq]; (ii) Bond and Building Commission, [Act 112 of 1960]; and (iii) Louisiana, Fiscal Authority [R.S. 17:2251, et seq].) By this improvement in constitutional authority to incur state debt, the security and ratings of bonds issued by the state was intended to be improved. However, Act 168 of 1965 (amending Article 4, Section 2) contains no language evidencing an intent to change the definition or meaning of the term 'capital improvement' as previously authorized by other constitutional authority. Article 4, Section 12(b) authorizes the State Market Commission to make loans for designated capital improvements. This provision of the Constitution and Statutes was not repealed nor amended by Act 168 of 1965.

"The Legislature of 1969 provided in Act 172 that the $2,000,000 of bonds therein authorized be secured by a pledge of the .53 mill tax levied by Act 109 of 1921 and additionally secured by a pledge of the full faith and credit of the state as authorized by Article 4, Section 2. The procedural requirements of Article 4, Section 2 for a pledge of the state's full faith and credit were complied with. The Legislative Calendar and Journal indicate beyond question that Act 172 of 1969 received the required two-thirds vote of the elected membership of each of the houses; that the funds from the bond issue are to be used to make capital improvements within the meaning of Article 4, Section 12(b) of the Constitution; that because there was more than one project, the amount allocated to each project was set out; an order of priority was stated. The Act specifically provides, authorizes and directs that the full faith and credit of the state be pledged to secure such bonds in addition to the .53 mill tax pledged. Although the bonds herein come within the scope of 'other constitutional authorization' and, therefore, within the meaning of one of the exceptions of Article 4, Section 2, it is also apparent that the Legislature intended and did provide in the proper constitutional manner for the additional security of an unconditional pledge of the full faith and credit of the State of Louisiana as is authorized by Article 4, Section 2 of the Constitution."

It is my view that the utilization of the instant bond proceeds for the purposes specified is not violative of Sec. 12 of Art. IV, La.Const. of 1921, supra. Both Sec. 12–b and Sec. 12 are sections of Art. IV, La. Const. of 1921. The provisions of one section are neither dependent on nor controlling of the other section.

I am compelled to conclude that Act 172 of 1969 is constitutional and does not vio-

late Art. IV, Sec. 2, La.Const. of 1921. The State Market Commission may make loans to Crowley Grain Drier, Inc. under the stipulated facts, supra, and the $2,000,000.00 of bonds may be issued, sold and delivered. The full faith and credit of the State of Louisiana, as authorized by Act 172 of 1969 and Art. IV, Sec. 2, La.Const. of 1921, may be pledged for the payment of the instant bonds.

I respectfully dissent.

249 So.2d 886

**Joseph Raymond FONTENOT**

**v.**

**J. WEINGARTEN, INC.**

**No. 50455.**

May 4, 1971.

Concurring Opinion June 3, 1971.

Dissenting Opinions May 5 and 12, 1971.

Rehearing Denied June 28, 1971.

