Lowell THOMAS, Jr., Lieutenant Governor, State of Alaska, and State of Alaska, Appellants,

v.

David L. ROSEN, Appellee.

No. 3073.

Supreme Court of Alaska.

Oct. 7, 1977.

Rodger W. Pegues, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellants.

Timothy G. Middleton, Eric E. Wohlforth, Wohlforth & Flint, Anchorage, for appellee.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, ERWIN and BURKE, Justices.

## OPINION

BURKE, Justice.

During its second session, the Ninth Alaska State Legislature passed Chapter 124, SLA 1976, which provided for submission to the voters of Alaska a proposition calling for the issuance of general obligation bonds in the amount of $7,100,000.00. The purpose of this act was to pay the costs of constructing regional fire fighting training centers in Anchorage, Fairbanks, Juneau, Kotzebue and Bethel.

On June 30, 1976, Governor Jay Hammond, in a purported exercise of his executive power to strike or reduce items in appropriation bills,[1] reduced the bond authorization from $7,100,000.00 to $4,200,000.00. This action presented the first use of the item veto in Alaska with respect to the amount of bonds authorized and to be voted on pursuant to Article IX, section 8 of the Alaska Constitution.[2]

Subsequent to the governor's action, a suit was initiated on August 11, 1976 by David L. Rosen, a taxpayer and registered voter of the State of Alaska, seeking a declaratory judgment and injunctive relief. The declaratory relief sought was a judgment that the governor's item veto was unconstitutional; injunctive relief was requested to force Lieutenant Governor Lowell Thomas, Jr. to put the proposition on the November 2, 1976, General Election Ballot in the form and with the amount provided for in the legislative enactment before the governor's item veto. The parties, after entering into a stipulation of facts, filed cross-motions for summary judgment. The lower court, in an order dated August 31, 1976, granted the plaintiff's motion for summary judgment. Judge Allen T. Compton held that:

Since Chapter 124, SLA 1976, is not an 'appropriation bill', Governor Jay Hammond's attempt to item veto portions thereof, without vetoing the entire bill, is an unconstitutional exercise of powers conferred upon him by the Alaska Constitution and is a nullity. The Act became law without the Governor's signature, and should be submitted to the electorate in accordance with Article IX, § 8, of the Alaska Constitution, in the form it was enacted by the Ninth Alaska Legislature.

While this appeal was pending, the November 2, 1976, election was held, and we take judicial notice that Chapter 124, SLA 1976, was approved by the electorate in its original form. The election result, although perhaps rendering this controversy technically moot, does not persuade us to decline review on such grounds, since we believe the matter falls under the public interest exception to the mootness doctrine.

This court in *Wagstaff v. Superior Court, Family Ct. Division*, 535 P.2d 1220, 1226

---

1. Alaska Constitution, Article II, section 15 provides:

   *Veto.* The governor may veto bills passed by the legislature. He may, by veto, strike or reduce items in appropriation bills. He shall return any vetoed bill, with a statement of his objections, to the house of origin.

2. Alaska Constitution, Article IX, section 8 provides:

   *State Debt.* No state debt shall be contracted unless authorized by law for capital improvements and ratified by a majority of the qualified voters of the State who vote on the question. The State may, as provided by law and without ratification, contract debt for the purpose of repelling invasion, suppressing insurrection, defending the State in war, meeting natural disasters, or redeeming indebtedness outstanding at the time this constitution becomes effective.

(Alaska 1975), reiterated the "public interest" exception to the mootness doctrine first articulated in *In re G. M. B.*, 483 P.2d 1006, 1008 (Alaska 1971). In *G. M. B.*, we established guidelines for determining when we will hear a matter that normally would be considered moot. We stated:

> To invoke the [public interest] exception, a two pronged test must be met: The dispute must be a recurring one, and its nature must be such that the mootness doctrine, if applied, would effectively [preclude review of the issue].[3]

The case at bar is one of great constitutional moment. It pits the political branches of our state government in a fundamental separation of powers confrontation. Rosen urges that the governor's use of the veto power on proposed bond issues as a method of fiscal control usurps the right of the electorate to approve or disapprove general obligation bonds proposed by the legislature. This argument, coupled with the fact that a challenge to an item veto may not come within sufficient time to fully litigate the matter and that such uncertainty could very well affect the marketability of the state bonds, persuades us that the public interest exception to the mootness doctrine is met.

■ The controversy before this court can be briefly summarized by utilizing the words of the lower court:

> Simply stated, the question before this Court is whether Chapter 124, SLA 1976,

is an 'appropriation bill' within the meaning of Article II, § 15, of the Alaska Constitution.[4]

In deciding whether the bond issue authorization constitutes an appropriation, we must first look to the intent of the framers of the constitution. *Warren v. Boucher*, 543 P.2d 731, 735 (Alaska 1975).

As stated above, section 15 of Article II empowers the governor to use his power of veto to "strike or reduce items in appropriation bills."[5] The constitutional history underlying this provision indicates a desire by the delegates to create a strong executive branch with "a strong control on the purse strings" of the state.[6] However, the delegates also appear to have intended to distinguish the appropriation process from debt financing. The following exchange is instructive.

> PRESIDENT EGAN: Would the Chief Clerk please read that sentence in Section 8 as it would read if the amendment was adopted.
>
> CHIEF CLERK: 'No state debt shall be contracted unless authorized for capital improvements by law with ratification by a majority of the qualified voters of the state who vote on the question.'
>
> PRESIDENT EGAN: The question is, 'Shall the proposed amendment be adopted by the Convention?' Mr. Londborg.
>
> LONDBORG: I would like to ask one question regarding this. If the gover-

---

3. 483 P.2d at 1008.

4. Record on Appeal 60.

5. The history of the veto as a mechanism of executive power was briefly described by Judge Hatch in *People ex rel. Churchyard v. Board of Councilmen of City of Buffalo*, 20 N.Y.S. 51, 52–55 (Buf.Super.Ct.1892), *affirmed* 135 N.Y. 660, 32 N.E. 648.

> The word 'veto' is of Latin extraction, and, literally translated, reads, 'I forbid,' or 'I deny.' These words have a singularly ominous sound when they are applied in a democratic government, and at once call attention to the fact, and challenge the authority. There are, in constitutional governments, two fundamental theories upon which the grant of the power of veto rests: *First*, to preserve the integrity of that branch of government in

which the vetoing power is vested, and thus maintain an equilibrium of governmental powers; *second*, to act as a check upon corrupt or hasty and ill-considered legislation. These theories have entered into all debates touching the power. The right, when given at all, is usually lodged in the executive branch of government. . . . Franklin long ago stated one reason for the lodgment of this power in an executive. 'A single man may be afraid or ashamed of doing injustice; a body is never either one or the other, if it is strong enough. It cannot apprehend assassination, and, by dividing the shame among them, it is so little a piece that no one minds it.'

6. 3 Proceedings of the Alaska Constitutional Convention 1740.

nor vetoes this, would that necessitate three-fourths to override that on appropriations?

UNIDENTIFIED DELEGATE: No.[7]

Some guidance is also found in the Wisconsin Supreme Court's decision in *State ex rel. Finnegan v. Dammann*, 220 Wis. 143, 264 N.W. 622, 624 (1936). In that case, the court defined the term "appropriation."

'An appropriation is the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other.' (citation omitted).

For our purpose, the operative phrase "public revenue" is critical since it is the basis of the general fund and special funds from which the legislature may allocate money. *See State ex rel. Bonner v. Dixon*, 59 Mont. 58, 195 P. 841, 845–46 (Mont.1921). Thus, any time the legislature allocates monies from the general[8] fund or special funds, the governor's line item veto would be appropriate. However, the sale of general obligation bonds is the commitment of the state to a debtor relationship with those who purchase the bonds, and is therefore distinguishable from such allocations.

The contracting of state debt is governed by the Alaska Constitution which provides in Article IX, section 8:

*State Debt.* No state debt shall be contracted unless authorized by law for capital improvements and ratified by a majority of the qualified voters of the State who vote on the question. The State may, as provided by law and without ratification, contract debt for the purpose of repelling invasion, suppressing insurrection, defending the State in war, meeting natural disasters, or redeeming indebtedness outstanding at the time this constitution becomes effective.

It should be noted that except for specifically defined situations, which do not concern us here, the debt may not be contracted without the approval of the electorate. This requirement operates as a check on legislative power just as the item veto power of the governor[9] checks legislative appropriations. However, each functions in its own realm. Where there is a requirement of voter approval, there is less need for the executive check on legislative power.

This court stated in *Bradner v. Hammond*, 553 P.2d 1, 5–6 (Alaska 1976):

A problem inherent in applying the doctrine of 'separation of powers' stems from the fact that the doctrine is descriptive of only one facet of American government. The complementary doctrine of checks and balances must of necessity be considered in determining the scope of the doctrine of separation of powers. Both doctrines address and are designed to resolve the problem of efficient government versus tyrannical government and have as their goal the protection of the electorate from tyranny. (footnotes omitted).

In the case at bar, if the governor's veto of bond authorizations were to prevail, it would in effect allow the executive to interpose its judgment between the legislature and the electorate. Such an expansion of the item veto power is unwarranted and does violence to the checks and balances

---

7. 5 Proceedings of the Alaska Constitutional Convention 3414–15.

8. The general fund is not specifically created by statute but its existence is noted in AS 37.05.-155 which provides:

*Special funds.* (a) The following funds shall be treated for accounting purposes as accounts in the general fund:

(1) FICA administration fund (AS 39.30.-050);

(2) special revolving fund—surplus property (AS 44.71.030(c));

(3) Repealed by § 49 ch 32 SLA 1971.

(4) second injury fund (AS 23.30.040);

(5) the vocational rehabilitation small business enterprises revolving fund (AS 23.15.-130);

(6) fishermen's fund (AS 23.35.060).

(b) There shall be created in the general fund for each of the funds designated in (a) of this section a reserve equal to the excess of revenues received by each fund over expenditures made from that fund.

9. *See* note 1 *supra*.

mechanism built into our constitutional form of state government. *See Bradner v. Hammond, supra.*[10] We, therefore, affirm the ruling of the lower court and hold the governor's exercise of the item veto to general obligation bond authorizations to be unconstitutional since general obligation bond authorizations do not qualify as appropriations under Article II, section 15.

Our dissenting colleague finds great significance in the fact that Chapter 124, SLA 1976, contains language indicating that, in the event of voter approval for the issuance of the bonds, funds are to be "appropriated" out of the general fund to carry out the provisions of the act, and from the bond fund for the purpose of paying the cost of regional fire fighting training centers, as well as a pledge to use the "credit and resources of the state" to pay the bonds when they are due. This approach, we believe, is oversimplified, giving undue meaning to the terms used in the act.

We see valid reasons for differentiating between debt financing and other appropriations from public revenues. First, the check on the power of the legislature that lies in the people, as we have noted, means there is less need for the executive to have a "strong control on the purse strings." Second, the purposes are quite often different. Third, even under our holding, the executive still has the power to veto *any* bill in its entirety.[11]

Perhaps also worthy of mention is the problem presented by special obligation bonds if we were to adopt the position of the dissent. In that type of bonding, the general taxing power of the state is not pledged. The bonds are paid by revenues generated by the project. In such a case, as we understand the dissent, there would be an "appropriation" of money from the general fund to finance the floating of the bond and an "appropriation" of money from a special fund after it was sold to the project, so that the governor would be entitled to line item veto a bond authorization. This, we believe, would produce an untenable result. In such a case, the "purse" of the state would be only slightly affected— only by the monies required to float the bond, which is usually paid back out of the special fund. In such circumstances, where there is a check on the legislature's discretion coming directly from the people and repayment coming directly from the project, there is little need for this extraordinary executive power.

AFFIRMED.

BOOCHEVER, C. J., dissents.

BOOCHEVER, Chief Justice, dissenting.

The Alaska Constitution, art. II, sec. 15 says in part that the governor "may, by veto, strike or reduce items in appropriations bills." The question is thus presented as to whether Chap. 124 SLA 1976 constitutes an appropriation so as to be subject to this provision.

The constitutional convention sheds little light on the subject. It is apparent that the delegates never foresaw the problems involved in definition of "appropriation" or the interaction between the debt financing provision (art. IX, sec. 8) and the gubernatorial veto section (art. II, sec. 15).[1]

10. *See* note 5 *supra.*

11. We believe that this third factor was what the convention delegates had in mind when they were discussing the amendment to Art. 9, section 8, alluded to in note 1 of the dissent. Clearly, the delegates were concerned with preserving the governor's overall veto power.

1. One delegate approached the problem, but his reasoning was never made explicit. During the discussion on debt financing, the following exchange occurred:

PRESIDENT EGAN: Would the Chief Clerk please read that sentence in Section 8 as it would read if the amendment was adopted. CHIEF CLERK: "No state debt shall be contracted unless authorized for capital improvements by law with ratification by a majority of the qualified voters of the state who vote on the question." PRESIDENT EGAN: The question is "Shall the proposed amendment be adopted by the Convention?" Mr. Londberg. LONDBERG: I would like to ask one question regarding this. If the governor vetoes

The definition of appropriations set out in Black's Law Dictionary is:

The act by which the legislative department of government designates a particular fund, or sets apart a specified portion of the public revenue or of the money in the public treasury, to be applied to some general object of governmental expenditure, or to some individual purchase or expense. . . . Authority given by Legislature to proper officers to apply distinctly specified sum from designated fund out of treasury in given year for specified object or demand against state.[2]

Looking to the bill itself, it is abundantly clear that two appropriations are specified and that there is also an obligation to make a third and future appropriation. Sec. 3 provides:

If the issuance of these bonds is authorized by the qualified voters of the state, the amount of $24,850 or as much of that amount as is found necessary, is *appropriated* from the general fund of the state to the state bond committee to carry out the provisions of this Act and to pay expenses incident to the sale and issuance of the bonds authorized in this Act. (emphasis added)

The second appropriation is found in sec. 2:

If the issuance of these bonds is authorized by the qualified voters of the state, a specific fund of the state to be known as the "Regional Fire Fighting Training Centers Bond Fund" shall be established, to which shall be credited proceeds of the sale of the bonds described in Sec. 1 of this Act except for the accrued interest and premiums. There is *appropriated* from the "Regional Fire Fighting Training Centers Bond Fund" to the Department of Education the amount of $7,100,000. The proceeds of these bonds shall be allocated as follows:

| | | |
|---|---|---|
| (1) full service centers: | Anchorage | $2,300,000 |
| | Fairbanks | 2,300,000 |
| (2) limited service centers: | Juneau | 1,500,000 |
| | Kotzebue | 500,000 |
| | Bethel | 500,000 |

(emphasis added)

An obligation to make a future third appropriation is found in sec. 1, authorizing the issuance and sale of the bonds and pledging the "full faith, credit and resources of the state" to pay them when they fall due. The legislature is actually pledging that it or future legislators will include debt service for the bonds in future budgets.

Because there are at least two appropriations clearly stated in the bill—one to the Department of Education and one to the state Bond Committee—I believe that in those respects, the bill must be considered an appropriations bill for purposes of art. II, sec. 15.

---

this, would that necessitate three-fourths to override that on appropriations?
UNIDENTIFIED DELEGATE: No.
On the other hand, the convention did indicate several times a desire to have the governor be an active participant in the approval of debt financing. When the rudimentary form of art. IX, sec. 8 read "no debt shall be contracted . . . unless the debt shall be authorized *by a majority vote in each house of the legislature*" (emphasis added), an amendment was offered to change the qualification to "no debt shall be contracted . . . unless authorized *by law*" (emphasis added). One delegate noted that in the original form the sentence could be thought to mean "without the approval of the governor." He added, "That, of course, was never our intent in the first place."
The following exchange also took place:
BUCKALEW: One question before we vote on this . . . I just thought of it this minute, that would indicate approval by the governor, but I don't know what this means—whether the governor has to approve or not . . .
F. RIVERS: If I may help Mr. President—the usual process of making laws includes the approval by the governor or it becomes a law without his approval. So, when you say "by law," you take in all those steps. The way it was before, though, it might have been argued that you meant to exclude the governor, so I think this improves matters.

2. Black's Law Dictionary, 131 (4th ed. rev. 1968). *See State ex rel. Murray v. Carter*, 167 Okl. 473, 30 P.2d 700, 702 (Okl.1934). In *Fuselier v. State Market Commission*, 259 La. 185, 249 So.2d 569, 579 (1971), the Louisiana Supreme Court found a bonding authorization bill to constitute an appropriation for purposes of a state constitution article reading "No money shall be drawn from the treasury except in pursuance of specific appropriations made by law."

If the legislature so desired, it could separate the bond authorization bill from the bill appropriating funds, thus avoiding the problem here presented. A bill could authorize the incurrence of indebtedness and provide for voter ratification. After ratification occurred, a separate bill could provide the appropriation. This was the method used in issuing the first bonds after statehood.[3] At the time of authorizing the indebtedness, the legislature could, by that means, avoid the applicability of the governor's powers to strike or reduce items in appropriation bills. Yet the governor's powers would be preserved at the time of the separate enactment of an appropriation bill.

While art. II, sec. 13 generally requires that bills containing appropriations be confined to appropriations, I believe that the legislature has the power to include qualifications or restrictions in an appropriation bill. Here the bond authorization and the appropriation are so entwined that I do not believe that the requirement of art. II, sec. 13 is violated.[4] Extensive discussion is not now required on this point, as it was not reached by the majority opinion.

---

**3.** See Chapters 169–174 SLA 1960. The 1960 bills did make appropriations to cover administration expenses, although that, also, could have been taken care of by a separate bill.

**4.** See *Weldin v. Ray,* 229 N.W.2d 706 (Iowa 1975); *Opinion of the Justices,* 306 A.2d 720 (Del.1973); *State v. Bond,* 495 S.W.2d 385 (Mo. 1973); *Opinion to the Governor,* 239 So.2d 1 (Fla.1970).