Stephen A. McALPINE, Lieutenant Governor of the State of Alaska,
Appellant,

v.

UNIVERSITY OF ALASKA, Appellee.

No. S–2674.

Supreme Court of Alaska.

Sept. 9, 1988.

James L. Baldwin, Asst. Atty. Gen. and Grace Berg Schaible, Atty. Gen., Juneau, for appellant.

Avrum M. Gross and Susan A. Burke, Gross & Burke, Juneau, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

In this expedited appeal, we review a summary judgment removing from the No-vember 1988 general election ballot an initiative that would establish a separate community college system within the state government and require the University of Alaska to transfer property to the new system. The superior court held that the initiative would make an appropriation, violating AS 15.45.010 and article XI, section 7 of the Alaska Constitution which prohibit the making of appropriations by initiative, and ordered it removed from the 1988 general election ballot. We agree, but hold that the appropriate remedy in this case is to sever the offensive portion and allow the remainder to be placed on the ballot.

### I.

#### A. *Restructuring of University of Alaska*

Prior to restructuring in 1987, the University of Alaska was composed of five administrative units: University of Alaska–Fairbanks; University of Alaska–Anchorage; University of Alaska–Juneau; Anchorage Community College; and the community college, rural education and extension (CCREE) unit. The CCREE unit oversaw programs in ten community colleges located around the state. Anchorage Community College was treated separately because of its size.

Donald O'Dowd, President of the University, stated in an affidavit that chancellors headed each of the five units. The chancellors controlled separate administrative structures and reported to the president. Within the CCREE unit, presidents headed each community college. The presidents controlled separate administrative structures and reported to the CCREE chancellor. Thus, the southcentral region of the state alone had three chancellors and two college presidents, each of whom headed an administrative substructure of vice chancellors or vice presidents and numerous department heads.

The University's budget for fiscal year (FY) 1985 was $170 million. Thereafter, appropriations declined. The budget in FY 1986 was $22 million less than FY 1985, and in FY 1987 the budget was reduced by

another $15 million. The University president became convinced that to maintain the existing level of services in the face of the substantial budget cuts, it was necessary to reduce duplication in the University's administrative structure. After over forty hours of public hearings, the president proposed a reorganization plan to the Board of Regents, the governing body of the University, in December of 1986. With some modification, the Board adopted the plan.

The reorganization plan replaced the five administrative units with a three-unit structure, with each unit representing a geographical area of the state rather than a particular type of program or institution. The merger did not cut back on the services previously offered by the community colleges, but only changed their administration. The programs previously administered by the individual community colleges are now administered by the regional institutions.

### B. *The Initiative*

In March of 1987, the Community College Coalition of Alaska and the Alaska Association of Community College Councils, Inc. submitted an initiative application (hereinafter referred to as "the community college initiative") to the State. The initiative proposed a bill which stated:

BE IT ENACTED BY THE PEOPLE OF THE STATE OF ALASKA:

There shall be established a separate independent Community College System in the State of Alaska. The University of Alaska shall transfer to the Community College System of Alaska such real and personal property as is necessary to the independent operation and maintenance of the Community College System. The amount of property transferred shall be commensurate with that occupied and operated by the Community Colleges on November 1, 1986. Properties created for the purpose of joint use by the University and Community College System shall continue to be jointly used.

Lieutenant Governor Stephen McAlpine, who is charged with reviewing initiative applications for compliance with statutory requirements, *see* AS 15.45.070–.080, requested the attorney general to examine the application. After the attorney general concluded that the initiative satisfied the statutory requirements and did not concern a prohibited subject, on April 22, 1987 the lieutenant governor certified the proposed initiative as being in the proper form. Pursuant to AS 15.45.090, he then prepared a petition containing the proposed bill along with an impartial summary of it drafted by the attorney general. The sponsors of the initiative circulated the petition among the voters in an effort to garner the 18,253 signatures needed before the initiative could go on the ballot.[1]

Meanwhile, counsel for the University orally requested the attorney general to reconsider her recommendation that the lieutenant governor certify the application. In particular, the University argued that the initiative would make an appropriation in violation of AS 15.45.010 and article XI, section 7 of the Alaska Constitution. The attorney general responded by letter dated July 24, 1987. In the letter, she stated her opinion that the initiative would not make an appropriation because, although it would require the University to transfer property, no property would be given away to private interests. The letter concluded by saying: "Please keep us informed if you intend to file an action to test the validity of our advice."

Subsequently, the sponsors completed the process of gathering voter signatures, and filed their petition with the lieutenant governor on December 17, 1987. Two weeks later, the lieutenant governor verified that the petition contained the requisite number of signatures and directed that it appear on the November 1988 general election ballot.

---

1. Such a petition must "be signed by qualified voters equal in number to 10 per cent of those who voted in the preceding general election and resident in at least two-thirds of the election districts of the state" before it can go on the ballot. AS 15.45.140.

C. *Proceedings*

The University filed the complaint initiating this action on December 23, 1987. The complaint alleged that the lieutenant governor's certification of the initiative application was improper because the initiative would make an appropriation and was too incomplete and vague to enact a law. The superior court granted summary judgment in favor of the University on the ground that the initiative would make an appropriation.

Lieutenant Governor McAlpine appeals. The questions presented are (1) whether the thirty-day statute of limitations contained in AS 15.45.240 barred the University's challenge of the initiative; (2) whether the initiative would make an appropriation; and (3) whether the initiative is too vague to enact a law.

On August 19, 1988, we issued an order vacating the superior court's grant of summary judgment in favor of the University, and directing the lieutenant governor to place the initiative on the general election ballot in November, 1988. We stated that an opinion would follow.

On August 25, 1988, we amended our prior order and directed the lieutenant governor to delete the third sentence of bill and place the remainder on the ballot. We now explain our decision.

## II.

As an affirmative defense, the lieutenant governor pleaded that the thirty-day statute of limitation contained in AS 15.45.-240 barred the University's suit. Alaska Statute 15.45.240 provides:

Judicial review. Any person aggrieved by a determination made by the lieutenant governor may bring an action to have the determination reviewed within 30 days of the date on which notice of the determination was given by any appropriate remedy in the superior court.

The lieutenant governor certified the initiative as being in the proper form on April 22, 1987. While the record does not disclose the exact date on which the University received notice of that determination,

the University concedes that it had "actual notice" at least as early as July 24, 1987, the date the attorney general responded in writing to the University's oral request to reconsider the decision. The lieutenant governor argues that the thirty-day limitation period began to run at least by that date, and therefore expired by August 24, 1987. If so, the University's suit was untimely since it was not filed until four months later. The superior court rejected the lieutenant governor's argument, stating:

Whatever the sense of the state's and intervenors' arguments on the point (the university brought this action six *months* after it received actual notice of the state's decisions), the issue is controlled by *Boucher v. Engstrom*, 528 P.2d 456 (Alaska 1974), which stands for the rule that only those receiving statutory notice, the members of the initiative committee, are subject to the 30-day bar.

We examined AS 15.45.240 in *Boucher v. Engstrom*, 528 P.2d 456, 459 (Alaska 1974). That case concerned Lieutenant Governor Boucher's certification of an initiative proposing to relocate the state capital. After gathering the requisite number of signatures, the initiative committee received notice that the initiative was properly filed and would be placed on the ballot. *Id.* at 458. A year later, Engstrom challenged the placement of the initiative on the ballot, arguing that the subject of the proposed bill was improper. *Id.* at 459. One of Lieutenant Governor Boucher's defenses was that the thirty-day statute of limitation contained in AS 15.45.240 barred the suit. *Id.* We held that the thirty-day limitation applies solely to the initiative committee, a committee of three sponsors who represent all sponsors and subscribers in matters relating to the initiative. *Id.; see* AS 15.45.-030(3). We stated:

The thirty-day period specified in AS 15.-45.240 begins to run when the lieutenant governor gives notice of his determination. In the case at bar, only the members of the initiative committee were given notice of the lieutenant governor's

determination.[2] In this regard, the supe-. rior court, in its decision, stated in part:

It is fundamental that due process requires notice and the statutory scheme of AS 15.45.010–240 [15.45.240] does not provide for the giving of notice to the general public. The limitation of AS 15.45.240 only applies to those who receive notice of the lieutenant governor's action, the initiative committee.

A non-sponsor's right to obtain judicial review of the lieutenant governor's certification of an initiative application cannot constitutionally be precluded prior to giving notice to the public that certification has been made. Any other interpretation of AS 15.45.240 would render the statute unconstitutional.

*Engstrom*, 528 P.2d at 459 (footnote added). We also stated:

[A]fter the lieutenant governor decides that the initiative is properly filed and before the initiative is voted on by the electorate, the lieutenant governor's determination that the initiative is not in conflict with Article XI, Section 7 of the Alaska Constitution or with AS 15.45.-010, can be challenged by anyone.

*Id.* at.461. We read the *Engstrom* opinion as holding that AS 15.45.240 *always* applies only to the initiative committee. That is, the term "notice," as it is used in AS 15.45.240 to trigger the thirty-day limitation period, refers only to notice given by the lieutenant governor to members of the initiative committee and not to notice given to anyone else.[3]

In the fourteen years since we decided *Engstrom*, the legislature has not amended AS 15.45.240 in any way that would suggest that it disagrees with our interpretation expressed in that opinion. In spite of the legislature's apparent acquiescence, we are now convinced that this interpretation was wrong. For the following reasons, we overrule the portion of *Engstrom* construing AS 15.45.240.

First, we do not think, as suggested by *Engstrom*, that the legislature would have chosen the phrase "any person" in AS 15.-45.240 as a means of referring to the initiative committee—a body composed of exactly three sponsors. *See* AS 15.45.030(3).

Second, under the *Engstrom* interpretation, the thirty-day limitation period only applies to a determination that an initiative is *not* proper. It would never apply to a determination that an initiative *is* proper because the initiative committee would not be "aggrieved" as required by AS 15.45.-240. Yet, the wording of AS 15.45.240 suggests that it applies to all determinations of the lieutenant governor and not just to determinations that an initiative is not proper.

Third, we see no due process problem in applying the statute of limitation prospectively to any person to whom the lieutenant governor gives notice of his determination, regardless of whether such notice is required by statute.[4]

Fourth, sound and important public policies are in favor of requiring challenges to be brought within thirty days. In situations where an initiative is defective yet curable, a quick challenge allows the sponsors to correct the problem prior to gathering signatures in hope of still getting the proposed bill on the next ballot. This facilitates the enactment of laws by initiative, thus comporting with our "deferential attitude toward initiatives...." *Yute Air Alaska v. McAlpine*, 698 P.2d 1173, 1181 (Alaska 1985). Even in situations where an

---

**2.** At this point, we stated in a footnote:

AS 15.45.050, the only statutory provision regulating the manner of notice concerning initiative applications, provides:

Notice of the initiative committee on any matter pertaining to the application and petition may be served on any member of the committee in person or by mail addressed to a committee member as indicated on the application.

*Engstrom*, 528 P.2d at 459 n. 6.

**3.** The record and briefs in *Engstrom* indicate that the plaintiffs in that case had actual notice of Lieutenant Governor Boucher's determinations much earlier than thirty days before they filed their action. The actual notice plaintiffs received was by news reports.

**4.** The manner in which the lieutenant governor must give public notice would best be determined initially by the legislature. We invite the legislature to do so.

initiative is not readily curable, a quick challenge allows the sponsors to avoid some or all of the time, trouble, and expense of promoting the initiative and gathering many thousands of signatures.

We recognize that it benefits the challenger of an initiative to be able to delay filing suit until the sponsors collect the required number of signatures. To require otherwise will result in unnecessary suits challenging initiatives that will ultimately die on their own due to insufficient subscription. However, we believe the benefits of early litigation outweigh the detriments of more litigation.

The present case is a perfect example of what the legislature may have sought to avoid by enacting the thirty-day statute of limitation. The University's argument that the community college initiative would make an appropriation revolves mainly around a single sentence in the initiative that reads: "The amount of property transferred shall be commensurate with that occupied and operated by the Community Colleges on November 1, 1986." In his brief, the lieutenant governor characterizes this provision as "a secondary matter." Had the University filed suit earlier, the sponsors might well have chosen to rewrite the proposed bill so as not to contain the offending sentence *before* gathering 18,253 signatures. If later challenges such as the present one are allowed, initiative sponsors cannot hope to cure defects without expending the enormous effort and cost involved in gathering signatures for a second time. Furthermore, even if the sponsors attempted to do so, they may not be able to succeed in time for the next election.

The advantages of a thirty-day statute of limitation were probably apparent to the legislature when it enacted AS 15.45.240. Those advantages, as well as the text of the statute, lead us to conclude the legislature intended AS 15.45.240 to apply to all

persons and not just the initiative committee.

██ We next address whether we should apply this holding retroactively to bar the University's suit. In *Plumley v. Hale*, 594 P.2d 497, 503 (Alaska 1979), we reiterated four conditions that indicate when we will not apply a holding retroactively in a civil case:

1) the holding is one of first impression, or overrules prior law, and was not foreshadowed in earlier decisions; 2) there has been justifiable reliance on an alternative interpretation of the law; 3) undue hardship would result from retroactive application; and 4) the purpose and intended effect of the holding is best accomplished by prospective application.

In the present case, these conditions favor non-retroactivity. First, we overruled our earlier interpretation in *Engstrom* of AS 15.45.240. Second, in this expedited appeal, we are willing to assume that the University relied on our prior interpretation, which had been the law of this state for fourteen years, when it did not file suit within thirty days of receiving notice of the lieutenant governor's determinations.[5] Third, retroactive application would cause the University undue hardship; barring the present suit would prevent the University from raising important questions of state constitutional law. Fourth, the purpose of our holding is to interpret AS 15.45.240 in conformance with legislative intent. We believe the legislature intended to require all persons aggrieved by the lieutenant governor's determinations to file suit quickly or not at all. However, we also believe the legislature intended to provide adequate opportunity for people to file such challenges. To apply today's holding retroactively would deny the University that opportunity. We conclude that our present interpretation of AS 15.45.240 should not bar the University's suit.[6]

5. The record contains no testimony substantiating such reliance, nor did the superior court make such a finding.

6. Our interpretation of AS 15.45.240 relates to the type of challenger to whom AS 15.45.240 applies and not to the type of challenge. We

reserve the question whether AS 15.45.240 applies to claims that the lieutenant governor erroneously certified an initiative alleged to violate specific constitutional restrictions on the subject matter of initiatives. *See* Alaska Const. art. XI, §§ 1 and 7 (initiatives must enact laws, and cannot "be used to dedicate revenues, make or

## III.

The superior court determined that the community college initiative would make an appropriation in violation of article XI, section 7 of the Alaska Constitution. We agree.[7]

Article XI, section 7 of the Alaska Constitution provides: "Restrictions. The initiative shall not be used to ... make or repeal appropriations...." Alaska Statute 15.45.010 contains substantially the same language: "[N]o initiative may be proposed ... to make or repeal appropriations...."[8]

Dictionaries define "appropriation" as follows:

b: something that has been appropriated; *specif:* a sum of money set aside or allotted by official or formal action for a specific use (as from public revenue by a legislative body that stipulates the amount, manner, and purpose of items of expenditure) ...

Webster's Third New Int'l Dictionary 106 (1967).

The act of appropriating or setting apart; prescribing the destination of a thing; designating the use or application of a fund....

In governmental accounting, an expenditure authorized for a specified amount, purpose, and time.

. . . . .

*Public law.* The act by which the legislative department of government designates a particular fund, or sets apart a specified portion of the public revenue or of the money in the public treasury, to be applied to some general object of governmental expenditure, or to some individual purchase or expense.

Black's Law Dictionary 93 (5th ed. 1979).

We have discussed the concept of "appropriation" in prior cases. In *Thomas v. Rosen,* 569 P.2d 793, 796 (Alaska 1977), we referred to the Wisconsin Supreme Court's definition of "appropriation":

An appropriation is the setting aside from the public revenue of a certain sum of money for a specified object, in such a manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other.

*State ex rel. Finnegan v. Dammann,* 220 Wis. 143, 264 N.W. 622, 624 (1936). Later, in *Thomas v. Bailey,* 595 P.2d 1, 6 n. 21 (Alaska 1979), we noted that *Rosen* "indicate[d] that the term 'appropriations' frequently refers to money." We commented that *Rosen* did not "purport[ ] to offer a general definition of appropriations." *Id.*

### A. The term "appropriation" includes the setting aside of property other than money

 The community college initiative designates the use of state real and personal property, but does not explicitly refer to state money. The pertinent sentences of the proposed bill state:

The University of Alaska shall transfer to the Community College System of Alaska such real and personal property as is necessary to the independent operation and maintenance of the Community College System. The amount of proper-

---

repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, or enact local or special legislation"). *See also id.* art. II, § 13 (single subject rule). If applied to such challenges, the thirty-day statute of limitation might seriously frustrate those constitutional proscriptions and therefore might be unconstitutional. We do not foreclose this argument.

**7.** The lieutenant governor is charged with initially determining whether an initiative application is in the "proper form." Alaska Const. art. XI, § 2. *See also* AS 15.45.070–.080. His determinations include whether the sponsors and subscribers complied with the legal procedures for placing an initiative on the ballot, and whether the initiative contains statutorily or

constitutionally prohibited subjects which should not reach the ballot. *See Engstrom,* 528 P.2d at 460–61. Moreover, the lieutenant governor's determinations are subject to immediate judicial review prior to enactment of the bill. *Id.* at 460. The scope of judicial review prior to enactment of an initiative is limited to the scope of the lieutenant governor's determinations.

**8.** We have described AS 15.45.010 as "a statutory restatement of the constitutional restriction found in art. XI, § 7 of the Alaska Constitution." *Engstrom,* 528 P.2d at 460 n. 13. There is no argument in this case that the statute is more restrictive than the Alaska Constitution, or that the word "appropriations" is used differently in the two contexts.

ty transferred shall be commensurate with that occupied and operated by the Community Colleges on November 1, 1986.

We address whether a law that designates the use of state property other than money can be an appropriation.[9]

In *Thomas v. Bailey*, 595 P.2d 1, 7–9 (Alaska 1979) and then in *Alaska Conservative Political Action Comm. v. Municipality of Anchorage*, 745 P.2d 936, 938 (Alaska 1987) (*"ACPAC"*), we held that laws requiring the conveyance of state assets to people or entities outside the control of the state government ("give-away programs") are appropriations and cannot be enacted by initiative, regardless of whether the assets are money or other property.[10] However, the term "appropriation" encompasses more than just give-away programs. A typical appropriation involves *setting aside* funds for a particular purpose—for example, to pay for construction of a public building—rather than *giving away* funds. In neither *ACPAC* nor *Bailey* did we conclude that the term "appropriation" in-

cludes the setting aside of property (other than money) outside the context of give-away programs. However, we now extend the holdings of *ACPAC* and *Bailey*.

In *Bailey*, we determined that the delegates to Alaska's constitutional convention "wanted to prohibit the initiative process from being used to enact give-away programs, which have an inherent popular appeal, that would endanger the state treasury." *Bailey*, 595 P.2d at 7. Seeing no reason to prohibit the giving away of cash but to allow the giving away of land, we concluded that the constitutional prohibition must apply to give-away programs involving land as well as cash. *Id.* at 8–9.

Parallel reasoning applies in the present case. Outside the context of give-away programs, the more typical appropriation involves committing certain public assets to a particular purpose. The reason for prohibiting appropriations by initiative is to ensure that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs.[11] This rationale applies as much or

---

**9.** The proposed bill may require the University to transfer money to the new community college system, since money is a form of personal property. Arguably, the community colleges "operated" the amount of money that was budgeted for their use as of November 1, 1986. We need not resolve this issue, though, because we hold that the initiative would make an appropriation, as explained in the remainder of this section, regardless of whether it designates the use of state money.

**10.** At issue in *Bailey* was whether an initiative that would give away parcels of state land to Alaska residents would make an appropriation. *Bailey*, 595 P.2d at 2. We "concluded that by the term 'appropriations,' article XI, section 7 prohibits an initiative whose primary object is to require the outflow of state assets in the form of land as well as money." *Id.* at 7.

At issue in *ACPAC* was whether an initiative requiring the Municipality of Anchorage to transfer a municipally-owned utility to a private non-profit utility for one dollar was an appropriation. *ACPAC*, 745 P.2d at 936–37. We determined that the initiative, like the one at issue in *Bailey*, would enact a give-away program; therefore, it was an appropriation and was prohibited under the logic of *Bailey*. *Id.* at 938.

**11.** *See, e.g., 2 Proceedings of the Alaska Constitutional Convention* 931–32 (Dec. 16, 1955), in

which Delegate Taylor explained the delegates' concerns in part as follows:

Some states made a great mistake by not restricting the initiative measures and allowed pressure groups to gather great numbers of signatures to a petition and that petition would require the expenditure of large amounts of money, perhaps a great deal more than the state could possibly afford and sometimes they would also initiate some legislation to raise money, a revenue measure and then directed that the proceeds of that measure would be utilized for a particular purpose. In other words, it took the making of revenue measures and expenditure of the funds away from the legislature and in some instances the governmental functions and governmental institutions suffered a great deal.

Many other states have prohibitions against appropriations by initiative. The highest court of Massachusetts, interpreting its state's prohibition, explained:

[T]he principal reason for excluding appropriations from the initiative [is as follows:] "[A]n appropriation by the people of specific sums of money would knock spots, if I may use a slang expression, out of any State budget, and prevent any real regulation and careful administration of the finances of the State." 2 Debates in the Massachusetts Constitutional Convention of 1917–1918, 828–829 (1918).

*Slama v. Attorney General*, 384 Mass. 620, 428 N.E.2d 134, 139 (1981) (footnote omitted).

nearly as much to allocations of physical property as to allocations of money. To whatever extent it is desirable for the legislature to have sole responsibility for allocating the use of state money, it is also desirable for the legislature to have the same responsibility for allocating property other than money. Otherwise, the prohibition against appropriations by initiative could be circumvented by initiatives changing the function of assets the State already owns. We conclude that the constitutional prohibition against appropriations by initiative applies to appropriations of state assets, regardless of whether the initiative would enact a give-away program or simply designate the use of the assets.

B. *The property transfer provisions of the proposed bill are neither ancillary nor redundant because they designate the use of a particular amount of state assets, potentially reallocating them among competing purposes*

■ The lieutenant governor argues that the initiative merely accomplishes a reorganization transferring the administration of the state community college program from the Board of Regents to a new entity:

The primary purpose of the community college initiative is not to make or repeal an appropriation. The primary purpose of the initiative is to create a new entity to administer community colleges in the state. A new appropriation is not being made, nor is an existing appropriation being repealed. Authority to administer some of the existing property of the University is being assigned to another administrator. The intent is to move the assets so that they follow the function to which they are dedicated. Even if the initiative were silent as to a property transfer, such an event would necessarily take place.

The University counters this argument by noting that it "might make more sense if ... the initiative required only the transfer of assets *currently* being used on the effective date of the initiative." However, as the University reads the initiative, it requires

an amount of property *previously* used by the University for community college programs, specifically the property used as of November 1, 1986. This is the funding level for the function as it existed more than two years before the earliest date at which this initiative may become effective—at a time when the University budget was substantially higher and community colleges were administered through an entirely different structure. This is not an example of an existing appropriation following an existing function. It is a past funding level applied to a newly created agency. If adopted, the initiative will appropriate a 1986 level of funding to a 1988 function. . . .

The language of the proposed bill is somewhat ambiguous about whether the exact amount of property which was devoted to community college use on November 1, 1986 must be transferred to the new community college system. The third sentence of the proposed bill states: "The amount of property transferred shall be commensurate with that occupied and operated by the community colleges on November 1, 1986." The word "commensurate" in this context admits of different interpretations. "Commensurate" may denote the idea of a comparative measure. If so, the third sentence of the bill could mean that the new community college system will initially receive the same proportionate share of assets devoted to higher education as existed on November 1, 1986. Under that interpretation, the provision can be seen as merely protecting the relative position of community college operations as against all operations of the University.

In context, though, the better interpretation of the third sentence is that it designates the use of an ascertainable and definite amount of state assets, and not a proportionate share. We are strongly influenced by the impartial summary of the initiative which was prepared by the lieutenant governor. Pursuant to AS 15.45.-090, the lieutenant governor included that summary in the petitions which were then

circulated by the sponsors and signed by the voters. The summary states:

> The University would transfer to these community colleges all real and personal property needed for their operation and maintenance, *equal* to the amount of property occupied and operated by the community colleges on November 1, 1986.

(Emphasis added.)

Since the summary was prepared by the lieutenant governor and not the sponsors, it is not a failsafe indication of the sponsors' intent or of the proper interpretation of the proposed bill. However, we think the sponsors' lack of objection to this summary, coupled with their circulation of petitions containing it, indicates their acquiescence to its interpretation of the measure. Under that interpretation, "commensurate" means "equal."

So read, the third sentence of the initiative is neither ancillary nor redundant. The amount of property it would require the University to turn over to the community college system is the amount in use by the community colleges on November 1, 1986—two years earlier than the earliest date the proposed bill can be enacted. Following a period of serious cuts in the University's budget, such a provision could significantly alter the present allocation of assets to the community colleges.[12]

---

**12.** *Cf. Dorsey v. Petrott,* 178 Md. 230, 13 A.2d 630 (1940). This case involved a provision of the Maryland Constitution under which voters could repeal laws by referendum, but could not use that process to repeal laws that made appropriations. *Id.* at 633. At issue in *Dorsey* was a referendum to repeal a law that created a new commission to regulate Maryland's fisheries. *Id.* at 638. A different commission had previously regulated the fisheries. *Id.* The law set forth the specific duties of the new commission, the qualifications and mode of appointment of the commissioners; the duties of certain employees to be hired by the commission; and the maximum salaries of such employees. *Id.* The challengers claimed that the law made an appropriation in part because it provided that certain accounts payable to the previous commission for the purpose of stocking fish would instead be payable to the new commission for the purpose of stocking fish. *Id.* at 640. The

## C. *The fact that the initiative does not designate the use of specific articles of property does not save it from making an appropriation*

The lieutenant governor argues that the community college initiative would not make an appropriation because it does not specify particular items of property to be transferred to the new community college system. He states that it "may be considered a precursor to an appropriation" rather than an appropriation itself, because it "establishes standards for the property transfer but does not direct the transfer of real or personal property."

Other courts have held that laws that merely create new government programs or liabilities do not constitute appropriations. For example, in *District of Columbia Board of Elections and Ethics v. District of Columbia,* 520 A.2d 671, 675 (D.C. App.1986), the court held that an initiative establishing an overnight shelter program did not violate a prohibition against the use of initiatives for "laws appropriating funds," when the initiative itself committed no assets to the program. The court stated: "The funding level for overnight shelter still rests within the power of the elected members of the District of Columbia government and Congress." *Id.* (footnote omitted).[13]

Unlike the initiative at issue in *District of Columbia Board of Elections and Ethics,* the third sentence of the community

---

accounts were generated under a different law which allowed dam owners to pay certain sums for fish stocking in lieu of maintaining fish ladders. *Id.* The court found this provision designating the use of the funds to be an incidental appropriation, and stated that a law "cannot be converted into an appropriation bill merely because there may be an incidental provision for an appropriation of public funds." *Id.* In contrast, the community college initiative specifies the total amount of assets to be devoted to community colleges. We do not consider this to be incidental.

**13.** *See also State ex rel. Chase v. Preus,* 147 Minn. 125, 179 N.W. 725, 726 (1920) ("[t]he mere creation of the liability on the part of the state, or promise of the state to pay . . . is of no force, in the absence of an appropriation of funds from which the liability may be discharged").

college initiative specifies the amount of assets to be designated for community colleges. If the voters approve the initiative, it seems that no further legislative action would be necessary to require the University to transfer property to the community college system, or to specify the amount of property the University must transfer.[14] The only discretion the University administrators would have is to designate the precise articles or parcels to be transferred. Even then, that discretion is narrowly channelled by the words "commensurate with" in the initiative.[15]

We hold that, since the inclusion of the third sentence causes the community college initiative to designate the use of state assets in a manner that is executable, mandatory, and reasonably definite with no further legislative action, the initiative would make an appropriation. We affirm the superior court's holding in this regard.

■ The University also argues that, even without the third sentence, the second sentence causes the initiative to make an appropriation. The University reasons that the second sentence sets aside a certain amount of state assets for a particular use in the same manner as the third sentence, and that "[a]ppropriations are often made in terms of 'amounts necessary' rather than specific dollar amounts." As examples, the University cites this year's general appropriation act, which contains provisions appropriating "amounts required to pay interest on revenue anticipation notes" and "amounts required to be paid by the

state for the principal and interest on all issued and outstanding state guaranteed bonds." Ch. 154, §§ 7–8, SLA 1988.

We disagree, and find the University's examples inapposite. Without the third sentence, the community college initiative would still require that state property be devoted to community colleges. However, it would not specify the scale of the new community college system. This is unlike statutory provisions setting aside money to pay interest and principal on certain notes or bonds; the dollar amounts of those payments, though not specified in the statute, are readily calculable.

While the second sentence may remove from the legislature the discretion to eliminate all appropriations for community colleges, we see no realistic danger that the legislature would attempt to do so. As a practical matter, the second sentence leaves the legislature with all the discretion it needs with respect to appropriations for community colleges. Following the mandate which we have repeatedly stated that the people's right of initiative should be liberally construed, *see Bailey*, 595 P.2d at 3; *Municipality of Anchorage v. Frohne*, 568 P.2d 3, 8 (Alaska 1977); *Engstrom*, 528 P.2d at 462; we hold that the second sentence, independently of the third sentence, does not cause the initiative to make an appropriation.[16]

## IV.

The present case involves an initiative not yet put to a popular vote. Until now,

---

**14.** The proposed bill would not commit the assets beyond the reach of the legislature, since an initiated law "may not be repealed by the legislature within two years of its effective date ... [and] may be amended at any time." Alaska Const. art. XI, § 6. However, the fact that the legislature can amend an initiative appropriating state assets does not cause the initiative to make less of an appropriation, or to remove it from the prohibitions of article XI, section 7 of the Alaska Constitution.

**15.** Under the proposed bill, instead of transferring to the new community college system a building that had previously been used as a community college, the University might be able to substitute a different building of approximately the same size and function and in the same geographical area. However, the Univer-

sity may not be able to substitute a completely different type of property (e.g., desks or blackboards) without violating the "commensurate with" language in the initiative.

**16.** The University raises the possibility that, should the proposed bill require it to transfer some of its trust lands to the new community college system, the State will have to appropriate money to compensate the University for the "taking." We need not decide at this time whether compensation would be required because the necessity for future compensation does not convert the present measure into an appropriation where the *amount* of land to be transferred and the concomitant size of the future appropriation has not been removed from legislative discretion.

we have not considered whether Alaska courts have the power to sever a discrete constitutionally-impermissible portion of a proposed bill and order the remainder to appear on the next ballot without the sponsors reinstituting the certification and signature-gathering processes. Nor have we determined the circumstances under which such action would be appropriate.

We have analyzed severability of *statutes* enacted by the legislature. In *Lynden Transport v. State*, 532 P.2d 700, 711–15 (Alaska 1975), we construed the following savings clause contained in title 1, General Provisions of Alaska Statutes:

> Any law heretofore or hereafter enacted by the Alaska legislature which lacks a severability clause shall be construed as though it contained the clause in the following language, "If any provision of this Act, or the application thereof to any person or circumstance is held invalid, the remainder of this Act and the application to other persons or circumstances shall not be effected thereby."

AS 01.10.030; *see Lynden*, 532 P.2d at 711. We determined that it should not save a constitutionally-permissible portion of a statute "unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall." *Id.* at 713 (quotation marks and footnote omitted).

While AS 01.10.030 gives courts the authority to sever invalid portions of legislatively-enacted statutes, no analogous statute gives courts the authority to sever in-

valid portions of proposed initiatives.[17] However, we observe that the severability doctrine, as applied to statutes, was in existence as a matter of common law prior to the enactment of AS 01.10.030 in 1949. *See* ch. 98, § 1, SLA 1949; *see also Demmert v. Smith*, 82 F.2d 950, 951–52 (9th Cir.1936) (appeal from the U.S. District Court for the territory of Alaska); *Lynden*, 532 P.2d at 711–12 (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 312, 56 S.Ct. 855, 80 L.Ed. 1160, 1189 (1936) (discussing the statutory and non-statutory rules)).

To hold that courts have power to alter initiatives may frustrate the constitutionally-guaranteed right of the people to sponsor, subscribe to, vote on, and enact laws by initiative. A California court adopted this view in *Bennett v. Drullard*, 27 Cal. App. 180, 149 P. 368 (Cal.App.1915).[18] In that case, the court considered the validity of a single initiative that proposed a primary ordinance and two alternative ordinances. *Id.* at 369. The court determined that such an initiative was illegal. *Id.* at 370. The court held that it must invalidate the entire initiative rather than strike the two alternative ordinances,[19] stating:

> Here is a power granted unto the people, to propose their own laws for adoption, provided certain legal procedure be followed to properly place said laws before the voters. Assume, if you please, that certain features are included in such proposed laws or in connection therewith, which appealed to the voter, and in fact served as the controlling influence induc-

---

17. On its face, AS 01.10.030 does not apply to initiated measures even *after* adoption by the voters. It states that it applies to laws "enacted by the Alaska legislature." AS 01.10.030.

18. The California Supreme Court has apparently not ruled on the question of severability of an initiative prior to election. *See AFL–CIO v. March Fong Eu*, 36 Cal.3d 687, 206 Cal.Rptr. 89, 91 n. 27, 686 P.2d 609, 629 n. 27 (Cal.1984) (stating that an earlier decision from that court "left open the test of severability in preelection review").

19. A provision of the applicable city charter which stated that the council "must either adopt or enact such measure without alteration, or submit the same to the electorate" influenced the court. *Bennett*, 149 P. at 370. (Quotation

marks omitted.) An analogous city charter provision similarly influenced New Hampshire's highest court. *See Bell v. Arel*, 461 A.2d 108, 111, 123 N.H. 311 (N.H.1983) (preelection review of an initiative). After finding one provision of the initiative invalid, the court held that "the board [of aldermen] would have no authority to excise ... [the other] provisions from the proposed ordinance and to place them on the ballot without [the invalid] paragraph...." *Id.* The court reasoned that the city charter required the board to "either 'pass said measure without alteration' or 'submit the proposed measure without alteration' to the voters." *Id.* (emphasis deleted). In contrast, the Alaska Statutes contain no such provisions.

ing him to sign the petition. Has he not the right to assume, and should not the law protect him in the assumption, that he will have the opportunity and right to vote for the matters which he has petitioned for? Or, shall the law permit the alteration of the measures which he has proposed and petitioned for, to the extent that he will be unable to recognize the same when he comes to case his ballot? In fact, is not the whole theory of initiative legislation based upon the security that the legislation proposed and petitioned for by the people shall be voted upon at the polls by them without interference, revision, or mutilation by any official or set of officials?

*Id.* at 370.

Unlike that California court, we are persuaded that circumspect judicial exercise of the power to sever impermissible portions of initiatives will promote, rather than frustrate, the important right of the people to enact laws by initiative.[20] Striking the entire initiative on the ground that one sentence of secondary importance is constitutionally invalid would be strong medicine. Such a decision forces the sponsors to choose between abandoning their efforts altogether and submitting a new application and expending, for the second time, the significant time[21] and effort required to generate public enthusiasm and gather the requisite number of signatures. This would seriously impede the ability of the people to initiate laws, particularly when, as is often the case, the sponsors of an initiative are grass roots groups with limited resources.[22]

In the analogous case of *Meiners v. Bering Straits School District,* 687 P.2d 287 (Alaska 1984), we reviewed a petition for recall of certain school board members prior to the holding of a recall election. *Id.* at 292, 294. The requisite number of voters had already subscribed to the petition. *Id.* at 292. Alaska Statute 29.28.150(a)(3) (repealed by ch. 74, § 88, SLA 1985) required that such a petition contain "a statement of the grounds of the recall stated with particularity as to specific instances." Accordingly, the petition contained three paragraphs purporting to cite such grounds. *Id.* at 291–92. After finding that, as the parties agreed, paragraph three did not state sufficient grounds, the superior court held "that any one insufficient provision requires the entire petition to be rejected." *Id.* at 302. On appeal, we held that since two of those paragraphs stated sufficient grounds, the legally insufficient charges should be deleted and the remainder should go on the ballot. *Id.* at 302–03. We stated that the superior court's

construction would frustrate the purpose of the recall statute, significantly increasing the cost in both time and money of a recall effort. If, as was the case here, the recall petition is prepared without the assistance of legal counsel, and is attacked by counsel retained by either the target official or the public entity which he serves, the recall process would appear unduly to handicap the proponents of recall. Their only recourse if any deficiency were found would be to begin the process of circulating petitions again, with no assurance that their new petition would not fall to some different objection.

**20.** We found only one other case, *Gaines v. City of Orlando,* 450 So.2d 1174, 1182 (Fla.App.1984), in which a court severed an invalid portion of an initiative and allowed the remainder to go on the ballot. Without analysis, that court stated: "[W]here part of an initiative or referendum is unconstitutional and other parts are constitutional, the valid proposals should nevertheless be submitted to the voters, if they would have a possible field of operation." *Id.* at 1178 (footnote omitted). However, the initiative at issue in that case contained a severability clause, which the community college initiative does not. *Id.* at 1177.

**21.** The initiative process requires significant time not only as a practical matter, but pursuant to article XI, section 4 of the Alaska Constitution, which requires that an initiative not be placed on the ballot prior to "the first statewide election held more than one hundred twenty days after adjournment of the legislative session following the filing."

**22.** The State claims that the sponsors of the community college initiative are citizens' groups with limited resources. The record does not confirm or deny this.

*Id.*[23]

*Meiners* is analogous to the present case because the right to recall elected officials, just as the right to enact laws by initiative, is guaranteed by article XI of the state constitution and by statute. *See Meiners,* 687 P.2d at 295; Alaska Const. art. XI, §§ 1 & 8; AS 15.45.010–.240; AS 29.28.-130–.250 (repealed by ch. 74, § 88, SLA 1985 and replaced by AS 29.26.240–.360). In *Meiners* as well as in the present case, striking the entire petition rather than excising the invalid portion would place an unwarranted constriction on the rights of the people to express their will by popular vote.

The case at bar also involves separation of powers considerations. The state constitution invests the power to enact laws in the legislature and the people, but not the courts. Alaska Const. art. II, § 1; art. III, § 1; art. XI, § 1. Alaska courts are obligated to avoid interfering with the lawmaking process any more than is necessary.

The United States Supreme Court, motivated by similar concerns under the federal constitution when reviewing acts of Congress, stated:

> A ruling of unconstitutionality frustrates the intent of the elected representatives of the people. Therefore, a court should refrain from invalidating more of the statute than is necessary. As this Court

has observed, "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid."

*Regan v. Time, Inc.,* 468 U.S. 641, 652, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487, 497 (1984) (plurality opinion) (quoting *El Paso & Northeastern Ry. v. Gutierrez,* 215 U.S. 87, 96, 30 S.Ct. 21, 24, 54 L.Ed. 106, 111 (1909)). We think that Alaska courts have a comparable duty under the state constitution.[24] However, that duty of Alaska courts applies when they review initiatives as well as when they review acts of the legislature, since the people share with the legislature the power to enact laws.[25]

■ ■ For the foregoing reasons, we hold that the duty of a court in conducting a preelection review of an initiative is similar to the court's duty when reviewing an enacted law. In particular, when the requisite number of voters have already subscribed to an initiative, a reviewing court should sever an impermissible portion of the proposed bill when the following conditions are met: (1) standing alone, the remainder of the proposed bill can be given legal effect; (2) deleting the impermissible portion would not substantially change the spirit of the measure;[26] and (3) it is evident

---

23. The analogy of *Meiners* to the present case is not exact. The record in this case does not disclose whether the community college initiative was prepared without the assistance of counsel. Nor are the proponents of the community college initiative handicapped by financial inability to pursue this litigation, since the State has undertaken to represent their interests. Furthermore, a recall is different from an initiative. Sponsors of a recall petition want to remove a person from office. They would probably continue to want that person removed even if some of their grounds are adjudged legally insufficient. Thus, they care more about the result than the exact text of their petition. An initiative, on the other hand, proposes a law defined by its text. Some sponsors or subscribers may regard the wording as crucial.

24. We have alluded to but not examined the contours of the doctrine of severability as mandated by separation of powers under the state constitution. *See, e.g., VECO Int'l v. Alaska Pub. Offices Comm'n,* 753 P.2d 703, 713 (Alaska 1988)

("separation of powers decreed by the state constitution requires that this court strike ... [a systemically overbroad] statute in its entirety, rather than re-draft it"). This court's decisions in recent severability cases were controlled by AS 01.10.030, the general savings statute for legislatively-enacted laws, rather than directly by concerns of separation of powers. *See, e.g., Vik v. Commercial Fisheries Entry Comm'n,* 636 P.2d 597, 601 (Alaska 1981); *Williams v. Zobel,* 619 P.2d 422, 430 (Alaska 1980), *rev'd on other grounds,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982).

25. The federal constitution contains no comparable provision for the people to enact federal laws by initiative.

26. Where nearly all of an initiative is invalid, other courts have refused to put the remainder on the ballot regardless of the intent of the sponsors. *See Alexander v. Mitchell,* 119 Cal. App.2d 816, 260 P.2d 261, 268 (1953) (after determining that "practically all of the many pro-

from the content of the measure and the circumstances surrounding its proposal that the sponsors and subscribers would prefer the measure to stand as altered, rather than to be invalidated in its entirety.[27] *Cf. Lynden Transport*, 532 P.2d at 713.

In the present case, it is manifest to us that the primary goal of the sponsors and subscribers of the community college initiative is to reorganize what is presently the University so the community colleges will be administered separately from the other programs. While the sponsors and subscribers also desired to specify the level of assets at which the new community college system would be funded, we have little doubt that they would be content to leave that decision to the legislature, rather than to have their proposal invalidated in its entirety. We agree with the State that the third sentence of the bill is a "secondary matter;" to sever it would not substantially change the spirit of the measure. Thus, the second and third prongs of the severability test are satisfied.

The first prong of the test is whether the remaining portion of the proposed bill, when standing alone, can be given legal effect. This requirement is the same as the prescript contained in article XI, section 1 of the state constitution that initiatives be used only to enact laws. We now address whether that requirement is satisfied.

We last examined the requirement that initiatives be used only to enact laws in *Yute Air Alaska v. McAlpine*, 698 P.2d 1173 (Alaska 1985). That case involved an initiative one portion of which "require[d] the governor to seek repeal of the federal statute (the Jones Act) which requires the use of United States vessels for shipping goods between United States ports." *Id.* at 1175. Challengers of the initiative contended that this provision, if enacted, was not a proper subject for initiatives because it would not be a law but a statement of public policy. *Id.* at 1175. In rejecting this challenge, we quoted the superior court's memorandum decision, which, in our view, properly resolved the issue: "Those provisions establish a public policy and they make it the chief executive's duty to carry that policy out. They are a solemn expression of legislative will, and that is what law is all about." *Id.* at 1176. We also stated that the relevant section would constitute a law and not a resolution because it "mandates action by the governor.... A resolution is advisory; action can only be required by law." *Id.* at 1182.

We hold that the community college initiative would enact a law. Unquestionably, the initiative leaves out a vast amount of technical detail. For example, it sets up no governing body for the new community college system. Nor does it explicitly set forth the function of the new system. However, it does mandate action. While it does not specify who must act, at the very least the governor is bound, since the governor is charged with executing the laws of the state. The initiative requires the governor to undertake specific conduct—namely, to establish a new administrative unit for community colleges. This is an enforceable command and not just an entreaty or expression of public opinion.

We conclude that the remaining undeleted portion of the community college initiative is clear and complete enough to satisfy the requirement that initiatives enact laws. Accordingly, the severability test is satis-

---

visions" of a proposed ordinance were invalid, the court held that submitting the remainder to the voters was inappropriate despite the fact that the measure contained a severability clause); *Fossella v. Dinkins*, 66 N.Y.2d 162, 495 N.Y.S.2d 352, 485 N.E.2d 1017, 1019 (N.Y.1985) (where a proposition was "manifestly invalid in a substantive respect," it would be inappropriate to submit it to the electorate "in a redacted and possibly confusing form"); *McCabe v. Voorhis*, 243 N.Y. 401, 153 N.E. 849, 853 (N.Y.1926) (when the only valid portion of an initiative was "inconsequential," "[t]o separate the good from the bad and permit the submission to the voters of a maimed and worthless thing would be folly").

**27.** We express no opinion on whether the lieutenant governor can exercise this same power to excise in the absence of a court order directing him to do so. Nor do we address whether either the lieutenant governor or the courts have the power to reword an initiative other than by deletion.

fied. We direct the superior court to order the lieutenant governor to sever the third sentence of the proposed bill and place the remainder on the ballot. The remainder will read as follows:

BE IT ENACTED BY THE PEOPLE OF THE STATE OF ALASKA:

There shall be established a separate independent Community College System in the State of Alaska. The University of Alaska shall transfer to the Community College System of Alaska such real and personal property as is necessary to the independent operation and maintenance of the Community College System. Properties created for the purpose of joint use by the University and Community College System shall continue to be jointly used.

The sponsors need not institute for a second time the certification and signature-gathering processes for this remaining portion of the initiative.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.